# EXHIBIT 2

FINAL 2024-11-07

## AMERICAN ARBITRATION ASSOCIATION
### Commercial Arbitration Rules
### Procedures for Large, Complex Commercial Disputes

**CLEARVIEW AI, INC.,**

        Claimant,

v.

**INVESTIGATIVE CONSULTANTS, INC., et al.,**

        Respondents.

**AAA Case No. 01-23-0002-6322**

**Arbitrator: Usher Winslett**

## FINAL AWARD

**November 7, 2024**

FINAL 2024-11-07

## TABLE OF CONTENTS

A.  PARTIES ............................................................................................................ 1

B.  ARBITRATION AGREEMENT ....................................................................... 1

C.  UNCONTESTED FACTS................................................................................... 1

D.  PRE-HEARING PROCEDURAL HISTORY .................................................. 4

E.  THE DISPUTE ................................................................................................. 11

    1.  Clearview's Claims................................................................................... 11

        i.  Am. SOC, Count I – "Breach of Contract with Respect to the Non-Conforming Data" ............................................................. 11

        ii.  Am. SOC, Count II – "Breach of Contract with Respect to Exclusivity".... 13

        iii.  Am. SOC, Count III – "Fraudulent Inducement"................................. 13

        iv.  Am. SOC, Count IV – "Fraudulent Misrepresentation and Concealment" 14

        v.  Am. SOC, Count V – "Unjust Enrichment" ....................................... 15

        vi.  Am. SOC, "Prayer for Relief" ............................................................. 15

    2.  Respondents' Counterclaim...................................................................... 15

        i.  "Breach of Contract" ............................................................................ 15

        ii.  Request for relief ................................................................................. 16

F.  THE HEARING ................................................................................................ 16

G.  REASONING .................................................................................................... 21

    1.  Am. SOC, Count I – "Breach of Contract with Respect to the Non-Conforming Data" ................................................................................... 21

        i.  Questions presented:............................................................................. 21

        ii.  Discussion: ........................................................................................... 21

            a.  Liability:........................................................................................ 21

            b.  Damages:........................................................................................ 27

    2.  Am. SOC, Count II – "Breach of Contract with Respect to Exclusivity" ................. 29

        i.  Questions presented:............................................................................. 29

        ii.  Discussion: ........................................................................................... 29

    3.  Am. SOC, Count III – "Fraudulent Inducement"................................... 30

        i.  Questions presented:............................................................................. 30

ii.    Discussion: ............................................................................... 30

4.    Am. SOC, Count IV – "Fraudulent Misrepresentation and Concealment" ............ 31

    i.    Questions presented: ........................................................ 31

    ii.    Discussion: ....................................................................... 32

5.    Am. SOC, Count V – "Unjust Enrichment" ................................. 32

    i.    Questions presented: ........................................................ 32

    ii.    Discussion: ....................................................................... 32

6.    Clearview's "Alter Ego" Claim against Berlin ............................. 34

    i.    Question presented: .......................................................... 34

    ii.    Discussion: ....................................................................... 34

7.    Respondents' Counterclaim – "Breach of Contract" ................................... 36

    i.    Question presented: .......................................................... 36

    ii.    Discussion: ....................................................................... 36

8.    Costs and Fees .............................................................................. 37

    i.    Questions presented: ........................................................ 37

    ii.    Discussion: ....................................................................... 37

H.    AWARD ................................................................................................ 39

Case 1:25-cv-00049-JPO     Document 1-6     Filed 01/03/25     Page 5 of 69

FINAL 2024-11-07

### A.  PARTIES

1.      Claimant Clearview AI, Inc. ("**Clearview**" or "**claimant**") is a Delaware corporation based in New York.

2.      Respondent Investigative Consultants, Inc. ("**ICI**") is an Illinois corporation based in the Washington, D.C. area.

3.      Respondent Donald Berlin ("**Berlin**") is an individual and president and CEO of ICI.

### B.  ARBITRATION AGREEMENT

4.      It is undisputed that Clearview and ICI entered into an agreement dated July 30, 2019 (the "Agreement" or "Term Sheet"), which includes the following arbitration clause:

> This Agreement shall be governed by the law of the state of New York applicable to contracts made in and performed entirely therein, and any controversy or claim arising out of or relating to this agreement shall be settled by arbitration before a single arbitrator in New York City, New York in accordance with the rules then obtaining of the American Arbitration Association

### C.  UNCONTESTED FACTS[1]

5.      Hoan Ton-That ["Ton-That", Clearview's co-founder and chief executive officer] and Donald Berlin were introduced in 2018.

6.      In 2[0]18, Berlin emailed Ton-That about Clearview's platform, "what this software or application truly needs is 'fuel' (or data, in this case)," and that "while photos are

---

[1] Except for the numbering, footnote, and bracketed language, the below is quoted directly from the parties' Joint Statement of Uncontested Facts submitted to me by email on August 14, 2024. The transmittal email from respondents' counsel explains: "Here is a joint statement of undisputed facts. To be joint, this omits statements previously included by Clearview to which ICI did not object until well after the deadline, and which Clearview therefore believes should be deemed admitted. However, we will address that separately. Those statements are omitted from this submission." (Underlining in the original.) When I refer to these "Uncontested Facts" herein, I will use the paragraph numbering in the Award, not in the original.

Case 1:25-cv-00049-JPO    Document 1-6    Filed 01/03/25    Page 6 of 69

FINAL 2024-11-07

indeed important - as that is the core product - but equally vital is the 'referential identity-based Meta Data products' that undergird the photos."

7.      In late 2018, Clearview purchased a sample data set from ICI.

8.      After initially sending the records without photos, ICI sent a Dropbox link to a file with records and photos.

9.      ICI then sent an example merged report, showing how the sample data could be used to create a report showing records and images for a given person.

10.     In this sample, the photos were joined to records to create an integrated report, with each photo accompanying the subject's personal data in a single report.

11.     Clearview and ICI signed the Agreement that precipitated this arbitration effective July 30, 2019.

12.     They called the work to be performed under the Agreement "Project Mugzee," referencing the underlying mugshot data.

13.     In exchange for $873,000, ICI agreed to provide "[a]pproximately 690 million arrest records and 390 million photos, fully joined, and quality tested."

14.     The data was to be "delivered in either CSV or JSON or other usable format as requested by the Buyer."

15.     Arrest information was to "include[] (at minimum): Name, State, Present and Past Address, SSN, DOB, Photo, Charges, Cell Phone or Home Phone, Email Address."

16.     The Agreement specified the following procedure:

- Money will be put into an escrow account upfront
- 6 weeks is given to procure both the separate image dataset and the records data; with a complete delivery of no more than 15 weeks following payment into Escrow
- Buyer, should receive the raw data, and do a check (1 week)

FINAL 2024-11-07

- 3 weeks is given to Investigative Consultants, Inc., (ICI) to join the data and do quality assurance, and money is drawn down.
- Buyer will then do another check of the joined data (1 week)

17.    Clearview wired the money directly to Berlin's personal checking account, rather than to an escrow account.[2]

18.    ICI did not deliver the data until February 2020.

19.    The Agreement required ICI to give Clearview the data in "CSV or JSON or other usable format as requested by the Buyer."

20.    The Agreement required ICI to provide "[a]pproximately 690 million arrest records and 390 million photos, fully joined, and quality tested."

21.    Then, Berlin sent Clearview another sample dataset which he told Clearview was "a representative, statistically significant sampling of the entire 5-6 billion record data mass."

22.    ICI said this sample was truly representative and had not been "gamed"— Berlin assured Ton-That that he "did not game this process to drive the outcome in order to show the power of the application," and that "[t]his is a repeatable process that can be applied across all 5-6 billion records that will compromise the national data set."

23.    Every data record in the sample data set had a photo connected to it in the same manner as the pre-Agreement sample that Berlin had provided to Clearview.

24.    Because the records were all connected with images, Ton-That was satisfied with the sample, and told Berlin that "[t]he JSON looks fine, it has all the information we need" and that it was "quite comprehensive and quite well structured."

---

[2] Notwithstanding the inclusion of this in the Uncontested Facts, I note that at the evidentiary hearing, Berlin testified that the payment was made to an ICI account, not to Berlin's personal account.

25.   ICI did not procure the data (without any assumptions as to its quantity or completeness) by September 2019.

26.   ICI did not deliver the data (without any assumptions as to its quantity or completeness) by November or December 2019.

27.   In February 2020, ICI delivered the data it had to Ton-That in New York. [The data was delivered on a number of hard drives (the "Hard Drives").]

28.   Berlin said at the time that this data was "fully joined."

29.   In October 2021, ICI sent Clearview a "Compliance Presentation" in which it claimed that the data it had provided was sufficient under the Agreement.

30.   ICI wrote that "all of the photos from the various sources were properly linked within [its] environment," and said that any problems joining records with photos were Clearview's fault.

31.   Berlin testified during his deposition that some of the data originally came from "vendor drives" provided by various vendors with whom Berlin contracted.

## D.    PRE-HEARING PROCEDURAL HISTORY

32.   On or about June 12, 2023, Clearview commenced this arbitration by filing with the American Arbitration Association ("AAA") a Commercial Arbitration Rules Demand for Arbitration and a document entitled, "NOTICE OF ARBITRATION AND STATEMENT OF CLAIM" (the "Statement of Claim"). The Statement of Claim named ICI and Berlin as respondents. On or about June 30, 2023, ICI and Berlin filed with the AAA a document entitled, "RESPONDENTS ICI AND DONALD M. BERLIN'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM" (the "Counterclaim").

Case 1:25-cv-00049-JPO    Document 1-6    Filed 01/03/25    Page 9 of 69

FINAL 2024-11-07

33.     The AAA invited me to serve as arbitrator in this matter on July 18, 2023. I accepted the appointment, and the AAA affirmed my appointment in an email to the parties dated August 7, 2023.

34.     Pursuant to the Commercial Arbitration Rules of the AAA effective September 1, 2022 (the "Rules"), I held a preliminary hearing by Zoom on September 1, 2023. On September 9, 2023, I sent the parties my draft of Procedural Order No. 1, asking them to "please review it carefully to make sure the schedule works." After considerable email discussion between the parties on scheduling and other matters, and ultimately an agreement by the parties on the order's terms, I issued Procedural Order No. 1 ("PO-1") on October 2, 2023. Per PO-1, all parties agreed, among other things that: (i) they "do not contest the arbitrability of the claims asserted in the arbitral pleadings" (para. 1); (ii) I have "jurisdiction over such claims" (*id.*); (iii) the Rules and the Procedures for Large, Complex Commercial Disputes apply (*id.* at para. 2); (iv) the applicable procedural law is the Federal Arbitration Act (*id.*); and (v) New York State law is the applicable substantive law (*id.*).

35.     Resulting from discussions at the preliminary hearing and further discussions between counsel, I issued a Stipulated Protective Order dated September 21, 2023.

36.     Before I issued PO-1, parties had requested permission to file dispositive motions, so I included in PO-1 a procedure for those applications, providing that each side could submit letters to me setting forth their respective positions. In those letters, each side's request was based on the argument that the other side's pleadings were insufficient. I denied both applications for the reasons set forth in Procedural Order No. 2, dated October 5, 2023.

37.     On or about October 18, 2023, Clearview submitted its Amended Statement of Claim ("Am. SOC"), which, like the Statement of Claim, named ICI and Berlin as respondents.

FINAL 2024-11-07

38.    By letter dated October 25, 2023, Berlin's counsel requested permission to file a motion to dismiss all claims against Berlin, asserting that "Berlin is not party to the arbitration agreement". By letter dated October 30, 2023, Clearview opposed Berlin's application. On November 3, 2023, I sent counsel an email in which I informed them that I would permit Berlin to make his motion to dismiss on jurisdictional grounds. I then allowed the parties to fully brief the dispute, but I was forced to delay my decision because I had to suspend the proceedings due to a payment delinquency by one or more of the parties.

39.    Around early January 2024, the AAA advised me that it had directed the parties to deposit sums for arbitrator compensation and administrative fees and that at least one of the parties had not made such deposits. Therefore, in accordance with Rule R-59, I suspended all administration on this matter until the parties made the required deposits. (*See* Procedural Order No. 3.)

40.    Thereafter, the AAA informed me the parties had cured their payment deficiencies, and on February 26, 2024, I issued Procedural Order No. 4 (attached hereto as Addendum No. 1), denying Berlin's motion but noting that nothing contained in the order prejudiced any non-jurisdictional arguments Berlin may wish to make at the evidentiary hearing, including arguments regarding alter ego liability.

41.    The parties then jointly requested a revised schedule for this arbitration. Accordingly, per the parties' agreement, on April 3, 2024, I issued Procedural Order No. 5 ("PO-5"), setting forth the revised schedule.

42.    On April 18, 2024, I issued Procedural Order No. 6, setting forth the procedure for submitting discovery issues to me.

43.    On April 24, 2024, the parties submitted discovery disputes to me in the form of a joint letter. And on May 1, 2024, I issued rulings on those disputes.

44.    On May 12, 2024, I issued Procedural Order No. 7.

45.    By letter dated May 12, 2024, respondents requested "leave to file a Motion to Strike Clearview's … demands for consequential and punitive damages." And in a letter dated May 15, 2024, respondents requested that I hold an evidentiary hearing concerning the disposition of the Hard Drives, among other things. On May 19, 2024, I issued Procedural Order No. 8, denying both requests for the reasons set forth in the order.

46.    On June 6, 2024, I issued an email order regarding certain discovery and scheduling issues.

47.    By application dated June 17, 2024, respondents explained that "Berlin … tested positive for COVID" and requested, among other things, that I "vacate the hearing date and the deadline for submission of witness testimony" pending "more information about Mr. Berlin's condition." In response, Clearview requested that I "order the parties to move forward as scheduled" and sanction respondents for what claimant characterized as "abusive delay tactics, which have and continue to cause Clearview substantial prejudice, including in the incurrence of unnecessary and excessive fees and costs." On June 18, 2024, I issued Procedural Order No. 9 ("PO-9"), postponing the hearing for one day and, among other things, denying Clearview's request for sanctions without prejudice to its right to renew the request at the conclusion of the evidentiary hearing.

48.    Per PO-5 and PO-9, the parties' pre-hearing briefs and all witness statements, among other things, were due on or before June 19, 2024. On the morning of June 19, I received an email from respondents' counsel updating me on Berlin's condition and requesting that I

FINAL 2024-11-07

extend the deadline for pre-hearing briefs. That same morning, I responded to all parties, explaining that I would grant a postponement only "upon sufficient cause shown". I also explained: "All current deadlines remain in place. I will consider postponing other deadlines in conjunction with considering Mr. Berlin's application, if any, to postpone the hearing." By email later that day, Berlin's counsel requested adjournment of the evidentiary hearing. Although the email did not specifically request an extension of the deadline for submitting Berlin's witness statement, his counsel did state, "there is no way to finish preparation of Mr. Berlin's testimony on time". But respondents' counsel did not request an extension of time to file their pre-hearing brief, which was due that day. By the morning of June 20, 2024, I had received claimant's pre-hearing brief and witness statements, but I had not received respondents'.

49.    On June 21, 2024, I held a hearing with counsel for all parties. And on June 22, 2024, I issued Procedural Order No. 10, in which I ordered the following:

1. The evidentiary hearing is postponed to **July 8-10, 2024**. …
2. Respondents may take the deposition of claimant's entity representative(s). Such deposition(s), if any, shall be scheduled as soon as possible, and respondents' counsel shall make reasonable efforts to accommodate the schedules of claimant's entity representative(s) and claimant's counsel. Such deposition(s) shall be limited to seven hours in total.
3. As soon as possible, but no later than **June 28, 2024**, respondents shall provide claimant with access to the servers and original vendor drives claimant has requested.
4. By **July 3, 2024**, claimant may submit a supplemented pre-hearing brief.
5. By **July 3, 2024**, respondents shall submit Donald Berlin's witness statement.
6. By **July 5, 2024**, Claimant may supplement the witness statements it previously submitted.
7. By **July 3, 2024**, the parties shall submit a stipulation of uncontested facts.
8. By **July 3, 2024**, the parties shall submit a testimonial roadmap, as described in paragraph 17(d) of PO-1.

Case 1:25-cv-00049-JPO    Document 1-6    Filed 01/03/25    Page 13 of 69

9. By **July 3, 2024**, the parties shall submit joint exhibits and contested exhibits, as described in paragraph 16(a) and (b) of PO-1, with the "responsive letter to the Arbitrator explaining why [any contested exhibits] should not be admitted into evidence" being submitted by **July 5, 2024**.

10. I will consider any application for costs related to the above at the evidentiary hearing.

(Bolding in original.)

50.    On June 26, 2024, respondents' counsel sent me a declaration signed by Berlin, in which he stated, among other things, that he was too ill to "adequately prepare for the hearing with [his] attorneys" and that his "ability to appear in New York at the hearing [was] in serious doubt." Thus, he posited that "there is sufficient cause to postpone the July 8 hearing". Mr. Berlin attached to the declaration a handwritten note, apparently from his doctor, stating: "Please excuse from work due to illness until July 8th due to illness." After considerable email discussion on the issue, and after I received additional information from Berlin's doctors, I issued Procedural Order No. 11 ("PO-11"), in which I adjourned the evidentiary hearing again, and instructed the parties to agree on new dates for the evidentiary hearing and other pre-hearing submissions.

51.    In PO-11, I also addressed respondents' failure to comply with PO-10, paragraph 3, which provides: "As soon as possible, but no later than **June 28, 2024**, respondents shall provide claimant with access to the servers and original vendor drives claimant has requested." (Bolding in original.) Respondents did not seek an extension of the above deadline and failed to comply with that order. Accordingly, Clearview requested that respondents "be precluded from contesting that Clearview's cloud copy is an accurate backup of the drives that ICI delivered to Clearview." Thus, as a part of PO-11, I ordered:

> At the evidentiary hearing, claimant may renew its request that respondents be precluded from contesting that claimant's cloud

FILED: NEW YORK COUNTY CLERK 12/23/2024 03:57 PM
NYSCEF DOC. NO. 6

INDEX NO. 659836/2024
RECEIVED NYSCEF: 12/23/2024

Case 1:25-cv-00049-JPO    Document 1-6    Filed 01/03/25    Page 14 of 69

FINAL 2024-11-07

copy is an accurate backup of the drives that ICI delivered to
Clearview. At that time, I will give respondents the opportunity to
oppose the request.

52.     On July 9, 2024, I received an email from respondents' counsel, stating the the

parties agreed that the evidentiary hearing would begin on August 19, 2024, and they also agreed

to deadlines for all other pre-hearing submissions. Respondents ignored not only those

agreements but also my emphatic and repeated instructions regarding the pre-hearing

submissions. Accordingly, on August 13, 2024, I issued Procedural Order No. 12 ("PO-12")

(attached hereto as Addendum No. 2), providing in part:

> 1. As a part of the final award in this case, I will award claimant its
>    costs and expenses associated with respondents' failure to
>    comply with my orders related to the submission of:
>
>> i. exhibits for the evidentiary hearing;
>>
>> ii. the joint statement of uncontested facts;
>>
>> iii. the joint testimonial roadmap;
>>
>> iv. an agreed date for the final pre-hearing conference; and
>>
>> v. the stipulated agenda for that conference.
>
> 2. Both sides shall have the opportunity to brief this issue,
>    including quantifying costs, in their post-hearing briefs.
>
> 3. Counsel shall meet and confer and submit to me by no later than
>    noon ET on August 14, 2024:
>
>> i. exhibits for the evidentiary hearing;
>>
>> ii. the joint statement of uncontested facts;
>>
>> iii. the joint testimonial roadmap;
>>
>> iv. the stipulated agenda for the final prehearing conference

53.     By email dated July 9, 2024, I informed the parties that I was not available on the

dates they had chosen for the evidentiary hearing and proposed August 26-28, 2024 instead. That

Case 1:25-cv-00049-JPO     Document 1-6     Filed 01/03/25     Page 15 of 69

**FINAL 2024-11-07**

same day both sides responded that my proposed dates were acceptable, and I confirmed that I

would hold the evidentiary hearing at the AAA office on August 26-28, 2024.

E.    **THE DISPUTE**

      **1.  Clearview's Claims**

    54.     Per its Am. SOC, ¶ 1, Clearview brought "this action against … Berlin and [ICI],

seeking recovery for damages arising out of Respondents' fraudulent inducement, fraudulent

misrepresentations and concealments, breaches of contract, and unjust enrichment." In the Am.

SOC, Clearview uses the defined terms "ICI", "Respondents", and "ICI Respondents"

interchangeably to refer to Berlin and ICI, "collectively". *Id.*

    55.     Many facts relevant to Clearview's claims are not in dispute – and thus listed

above – in the Uncontested Facts section. Accordingly, I will not repeat them here.

      **i.  Am. SOC, Count I – "Breach of Contract with Respect to the Non-
           Conforming Data"**

    56.     In Count I of the Am. SOC, ¶ 44, Clearview alleges that:

> (1) The Term Sheet constituted a valid agreement between
> Clearview and ICI; (2) Clearview fully performed its obligations
> under the Term Sheet by transmitting payment of $873,000 to ICI;
> (3) ICI failed to perform its obligations under the Term Sheet
> because the [data it delivered] did not meet the specifications of
> the Term Sheet—namely, it was un-joined, largely unusable by
> Clearview, and grossly insufficient in quantity and quality; and (4)
> Clearview was damaged by the loss of the funds it paid for ICI's
> anticipated performance under the Term Sheet, the lack of data of
> sufficient value in return, and consequent inability to improve the
> Clearview products and services and thus generate sales revenue
> and further capital investments from third parties.

    57.     In paragraph 45, Clearview further alleges that "prior to and at the time Clearview

entered into the Term Sheet with ICI, ICI made certain implied and express warranties with

respect to its technological capabilities" and then goes on to explain:

Page **11**

FINAL 2024-11-07

> The Term Sheet is explicitly clear on what ICI was to perform and deliver to Clearview, most notably: (1) "690 million arrest records and 390 million photos, fully joined, and quality tested will be delivered"; (2) "Arrest information … delivered in either CSV or JSON or other usable format as requested by Buyer"; (3) "Arrest information includes (at minimum): Name, State, Present and Past Address, SSN, DOB, Photo, Charges, Cell Phone or Home Phone, Email Address"

58.     In paragraph 46, Clearview contends that "[t]he significantly lower quantity and quality of un-joined data delivered by ICI is not what Clearview contracted for, is of no use to Clearview, and is not something Clearview would have paid $873,000.00 for." Clearview also alleges that its CEO and "key Clearview engineering personnel made good faith efforts to cooperate with ICI to obtain a fully joined dataset as required by the Term Sheet and promised by ICI."

59.     Presumably regarding its claim for consequential damages, Clearview states, "Clearview reasonably expected that integration of the Deliverables into the Clearview Application would dramatically improve the utility and attractiveness of the Clearview Application to prospective customers, and thereby result in substantial sales and profits." And Clearview also claims that it "had to dedicate significant time and resources to the ultimately unsuccessful effort to salvage anything of use from the Non-Conforming Data and was without critical funds that otherwise could have been used by Clearview to improve on and build its technology products." *Id.*

60.     Clearview concludes Count I by alleging that it "is entitled to compensatory and consequential damages, as well as equitable remedies".

Case 1:25-cv-00049-JPO    Document 1-6    Filed 01/03/25    Page 17 of 69

### ii. Am. SOC, Count II – "Breach of Contract with Respect to Exclusivity"

61.    In paragraph 31, Clearview "alleges on information and belief that Respondents violated the Term Sheet's exclusivity clause", contending "that discovery will show" that ICI and Berlin provided Clearview's competitors "with datasets that are materially similar to the data [ICI and Berlin] agreed to provide to Clearview."

62.    Then, based on the above allegation (among others), Clearview alleges "upon information and belief" in paragraph 49 that ICI and Berlin breached the exclusivity provision of the Term Sheet. And in paragraph 50, Clearview alleges that those breaches entitle it "to compensatory and consequential damages, as well as equitable remedies".

### iii. Am. SOC, Count III – "Fraudulent Inducement"

63.    In paragraph 52 of it Amended Statement of Claim:

> Clearview alleges that the Respondents fraudulently induced Clearview to sign the Term Sheet by representing that the sample data they provided was representative of hundreds of millions of additional pieces of data that they could provide under the Term Sheet, and that it would be fully joined and usable within the Clearview Application.

64.    Clearview goes on to allege that such representations were "material", that respondents knew they were false when they made them (paragraph 53), that respondents "intended that Clearview would reasonably rely on [them] when deciding to agree to the Term Sheet, and [that] Clearview did, in fact, reasonably rely on [them] when agreeing to the Term Sheet" (paragraph 54).

65.    Clearview further alleges that because of the above, "Clearview entered into a contract that Respondents knew ICI could not perform" (paragraph 55) and that "Respondents'

FINAL 2024-11-07

fraudulent inducement was willful, wanton, and indicative of a high degree of moral turpitude."
(Paragraph 56.)

66.    Thus, Clearview contends that it "is entitled to compensatory, consequential, and punitive damages, as well as equitable remedies, for Respondents' fraudulent inducement." (Paragraph 57.)

### iv. Am. SOC, Count IV – "Fraudulent Misrepresentation and Concealment"

67.    In paragraph 59, Clearview alleges that "Respondents made material fraudulent misrepresentations to, and concealed material information from, Clearview". And Clearview further alleges that "Respondents knew that they were unable and did not intend to provide the Deliverables [under the Term Sheet], and that they intended to breach the exclusivity clause of the Term Sheet." (*Id.*)

68.    Clearview also alleges that respondents "represented upon initial delivery that they had provided data that complied with the Term Sheet, when they had not" (paragraph 60) and that respondents "knew these representations were false when made" (paragraph 61).

69.    Clearview then alleges that "Respondents intended that Clearview would reasonably rely on these representations and concealments when agreeing to the Term Sheet" and that "Clearview did, in fact, reasonably rely on these representations and concealments when agreeing to the Term Sheet and wiring $873,000 to ICI." (Paragraph 62.)

70.    Clearview contends that "Respondents' fraudulent misrepresentations and concealments were willful, wanton, and indicative of a high degree of moral turpitude" (paragraph 64), entitling Clearview to "compensatory, consequential, and punitive damages, as well as equitable remedies" (paragraph 65).

Case 1:25-cv-00049-JPO   Document 1-6   Filed 01/03/25   Page 19 of 69

### v. Am. SOC, Count V – "Unjust Enrichment"

71.      In paragraph 67, Clearview reiterates its claim, "upon information and belief" that

respondents breached the exclusivity provisions of the Term Sheet and alleges that "[i]t would be

unjust and inequitable for the ICI Respondents to retain the proceeds of their fraud and breach or

breaches of the Term Sheet's Exclusivity provision" or to "retain their proceeds from their other

fraudulent acts and breaches …, including the funds they received from Clearview under the

Term Sheet."

72.      Thus, Clearview claims that it "is entitled to restitution and disgorgement for

ICI's unjust enrichment from its fraud and breaches." (Paragraph 68.)

### vi. Am. SOC, "Prayer for Relief"

73.      In paragraph 69, Clearview request the following:

A.      A finding that Respondents fraudulently induced Clearview
to agree to the Term Sheet, and otherwise defrauded
Clearview in connection with the Term Sheet;

B.      A finding that Respondents breached the provisions of the
Term Sheet as described above;

C.      Compensatory and consequential damages in an amount to
be determined at the hearing;

D.      Pre-judgment interest;

E.      Punitive damages for Clearview's fraud claims;

F.      Restitution;

G.      Disgorgement;

H.      Rescission;

I.      Attorneys' fees, costs, and expenses associated with this
action.

## 2. Respondents' Counterclaim

### i. "Breach of Contract"

74.      Per numbered paragraph 1 under the heading "COUNTERCLAIM BREACH OF

CONTRACT", both ICI and Berlin seem to be bringing a breach of contract counterclaim

against Clearview.

INDEX NO. 659836/2024
RECEIVED NYSCEF: 12/23/2024

Case 1:25-cv-00049-JPO    Document 1-6    Filed 01/03/25    Page 20 of 69

75.     Respondents alleged that the Term Sheet "is a valid, enforceable agreement" (paragraph 2) under which "Clearview had a duty to pay ICI a total of $918,000 upon ICI's performance of the agreement." (Paragraph 3.)

76.     Respondents further allege that "ICI fully performed the agreement, except to the extent Clearview refused to accept the servers with joined data" (paragraph 4) and that "ICI remains ready, willing, and able to deliver the servers and joined data in accordance with the Contract." (Paragraph 5.)

77.     Accordingly, respondents contend that ICI is entitled to "the full contract price" and that "Clearview owes ICI $45,000, plus prejudgment interest", to make ICI whole.

### ii. Request for relief

78.     Because of the above, "ICI respectfully requests the arbitrator award ICI $45,000, prejudgment interest, attorneys' fees, and such other relief as the arbitrator deems just and appropriate."

## F.     THE HEARING

79.     I held the evidentiary hearing August 26-28, 2024 at the AAA office located at 150 East 42nd Street, 17th Floor, New York, NY 10017.

80.     At the hearing, Clearview was represented by Collin Vierra, from Eimer Stahl, LLP; Thomas Mulcaire, Clearview's general counsel; and Maria Ibrahim, Clearview's Associate Legal Counsel. Respondents were represented by Steven Oster and David Lawler, both from The Oster Law Firm.

81.     The parties' pre-hearing submissions included:

a.  By Clearview:

    i.  Pre-hearing brief ("Cl. Pre-HB").

    ii. Ton-That's witness statement.

FINAL 2024-11-07

          iii.  Amos Kyler's ("Kyler") witness statement.

          iv.  Jesse Bangs's ("Bangs") witness statement.

          v.  Stonebridge Advisory Inc.'s expert's report ("Clearview's Expert's Report" or "Cl. Ex. Rep."), signed by Daniel P. O'Connell ("O'Connell") and Ryan P. O'Connell.

  b.  By respondents:

          i.  Pre-hearing brief ("Resp. Pre-HB").

          ii.  Berlin's witness statement.

          iii.  Thomas Marsh's ("Marsh") witness statement.

          iv.  A document titled, "Impeachment Testimony of Justin Kayatin".

  c.  By the parties jointly:

          i.  The Joint Statement of Uncontested Facts referenced above.

          ii.  As set forth in detail in PO-12, I instructed the parties to provide me with several other joint submissions, but they failed to do so. Nonetheless, in PO-12, I explained that I would consider the exhibits submitted by Clearview to be "joint exhibits", meaning just that I would deem them to be admissible at the evidentiary hearing without the necessity of laying a foundation for such admission.

82.    At the hearing, I heard opening statements from counsel and witness testimony from both sides. Instead of closing statements, counsel elected to submit post-hearing briefs. The parties presented the following witnesses:

  a.  By Clearview:

          i.  Ton-That

          ii.  O'Connell

          iii.  Bangs

          iv.  Kyler

  b.  By respondents:

FINAL 2024-11-07

      i.  Berlin

     ii.  Marsh

83.     At the hearing, Clearview requested permission to make an application for interim

relief, and the parties agreed to a briefing schedule and a date for oral argument on the issue. But

before submitting their briefs, the parties agreed that "[i]n lieu of arbitral briefing regarding an

interim award", they would enter into a stipulation that they would submit to me as a proposed

order. Accordingly, on September 6, 2024, they submitted a signed stipulation to me, which I

issued as an order on September 7, 2024. See the Stipulated Order attached hereto as Addendum

3, which orders the following:

> 1. Mr. Berlin and ICI shall not engage in any financial transactions
> outside of the ordinary course of business.
>
> 2. Mr. Berlin and ICI attest that they have not disposed of,
> encumbered, secreted, or removed assets with the intent of
> frustrating collection of a potential award, if any.
>
> 3. Mr. Berlin and ICI will not dispose of, encumber, secrete, or
> remove assets with the intent of frustrating collection of a potential
> award, if any.

84.     After the hearing, on September 5, 2024, I sent counsel an email explaining

(among other things):

> Both sides requested that I award costs and fees (see claimant's
> amended statement of claim, p. 25 (requesting "Attorneys' fees,
> costs, and expenses associated with this action" and respondents'
> answer, affirmative defenses, and counterclaim, p. 8 ("Clearview
> should be required to pay the costs of the arbitration as well as
> Respondents' costs and a reasonable attorneys' fee"). Thus, an
> award of costs and fees is appropriate under the AAA Rules. See,
> e.g., Rule R-49(d) ("The award of the arbitrator may include … an
> award of attorneys' fees if all parties have requested such an
> award"). Accordingly, each of your post-hearing briefs should deal
> with the issue of whether I should award costs and fees and any
> limitations on such an award. And in conjunction with submitting

your brief, each side should submit a declaration of counsel, identifying the costs and fees your client is seeking. For efficiency, and to avoid privilege issues, for attorneys' fees, I recommend a summary declaration, identifying each timekeeper, the number of hours that person worked, and the associated hourly rate. For costs other than attorneys' fees, I recommend including invoices. If the parties agree on another method of addressing your applications for costs and fees, I would be happy to consider it.

At the end of the evidentiary hearing and in a subsequent email, I identified some issues I would like you to address in your post-hearing submissions. To summarize, and perhaps add a few, here is a list:

1. Please send me a copy of the hearing transcript and all exhibits that were presented at the hearing.
2. Claimant's amended statement of claim includes claims for breach of contract, fraud, and unjust enrichment. Are those pleaded in the alternative? Is claimant claiming different damages for each of those claims? Counts I and II are both breach of contract claims; is claimant seeking separate/different damages for those two counts? Counts III and IV are both fraud related claims; is claimant seeking separate/different damages for those two counts?
3. Performance under the term sheet is obviously a central issue in this case, so I want to see the facts and law supporting each side's position on performance, including your positions on whether there was (at least) partial performance and how that would affect damages.
4. Claimant alleges that "ICI is an alter ego of its owner, President, and only known employee, Mr. Donald Berlin." CLEARVIEW AI, INC.'S AMENDED STATEMENT OF CLAIM, para. 4. Other than its claim of alter ego liability, does claimant assert that Mr. Berlin is personally liable for any other reason? Whatever the basis for the claim of Mr. Berlin's personal liability, I will need to see the facts and law that support it. And of course, respondents are free to point me to facts and law that refute the claim.
5. Timing/Procedure: If I were to find that each party to the term sheet failed to strictly adhere to the timing and procedure provisions set forth in the term sheet, would that relieve both parties of their obligations to strictly adhere to those timing/procedure provisions? If not, why not? And if you are taking the position that your client strictly adhered to those provisions, please point me to the evidence that supports that position.

6. Respondents asserted a counterclaim for breach of contract. RESPONDENTS ICI AND DONALD M. BERLIN'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM, pp. 7-8. Please point me to the evidence submitted at the evidentiary hearing to support that counterclaim, along with any relevant law.

7. Claimant claims that it made accurate copies of the files that ICI delivered on the hard drives. If respondents contest that those are accurate copies, respondents should point me to the evidence/law that supports that conclusion.

8. Each party should identify the exact relief that party is seeking, drafted precisely as that party would want the "award" section of the final award to read.

9. Both sides should submit their post-hearing briefs to me in Microsoft Word format.

Assuming you would like me to address your costs/fees applications as set forth above and to issue a single, all-encompassing final award, then you will need to provide me with additional briefing (in addition to your summary declarations) on top of what we discussed at the hearing. I believe you agreed at the hearing to limit post-hearing briefs to 20 pages, so I will increase that limit to 25 pages.

If you agree to another method for addressing your costs/fees application, please let me know and I will be happy to consider it. Please contact me with any questions.

Neither side requested an alternative method for addressing costs/fees applications, and each side addressed the issue in its post-hearing brief. Per my instructions, in support of its application for fees, Clearview submitted a summary declaration, identifying each timekeeper, the number of hours that person worked, and the associated hourly rate. And in support of its application for costs, it submitted invoices and receipts. Respondents, on the other hand, submitted no supporting documentation – or even the total amount requested.

### G.   REASONING

1. **Am. SOC, Count I – "Breach of Contract with Respect to the Non-Conforming Data"**

   **i. Questions presented:**

85.   Did ICI breach its obligation to provide Clearview the "Data" required under the Term Sheet?

86.   If ICI breached its obligation to provide the "Data" required under the Term Sheet, how (if at all) was Clearview damaged?

   **ii. Discussion:**

   **1. Liability:**

87.   The elements of breach of contract are "the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of its contractual obligations, and damages resulting from the breach." *Pare v. Aalbue*, 202 N.Y.S.3d 368, 373 (N.Y. App. Div. 2023) (citations omitted).

88.   As set forth above, the following facts are uncontested: In exchange for $873,000, ICI agreed to provide "[a]pproximately 690 million arrest records and 390 million photos, fully joined, and quality tested." (Uncontested Facts, ¶ 13, above) The arrest information was to "include[] (at minimum): Name, State, Present and Past Address, SSN, DOB, Photo, Charges, Cell Phone or Home Phone, Email Address." (*Id.* at ¶ 15.)

89.   The Term Sheet sets forth a detailed procedure for payment and for delivery, review, and approval of the data. (*Id.* at ¶ 16.) But it is uncontested that neither side strictly adhered to the agreed procedure. (*Id.* at ¶¶ 17, 18, 25-27.) Nonetheless, the parties agree that

Case 1:25-cv-00049-JPO    Document 1-6    Filed 01/03/25    Page 26 of 69

FINAL 2024-11-07

Clearview paid $873,000. (*See, e.g.*, Resp. Pre-HB, p. 1; Cl. Pre-HB, pdf p. 2 (the pages are not numbered).)[3]

90.     Respondents argue that ICI complied with its obligations under the Term Sheet. (*See* Resp. Pre-HB, pp. 3-7.) They also argue that Clearview lost the Hard Drives, which, they contend, entitles ICI to "an adverse inference under applicable New York law" (citing *Pegasus Aviation I, Inc. v. Varig Logistica S.A.*, 26 N.Y.3d 543, 547-48, 46 N.E.3d 601, 602 (2015)). (Resp. Pre-HB, pp. 6-7.)

91.     The evidence regarding the fate of the original Hard Drives is mixed, with each side blaming the other for their disappearance. (*Compare* Ton-That Witness Statement, ¶ 30 ("we returned the original hard drives to Mr. Berlin") to Berlin Witness Statement, ¶¶ 39, 56 ("I never asked for or received the hard drives back from Clearview"; "Clearview misplaced the Drives"); *see also*, respondents' post-hearing brief ("Resp. Post-HB"), pp. 10-17 (citing testimony on the issue).)

92.     But contrary to respondents' position, at the end of the day, the dispute over the whereabouts of the original Hard Drives is inconsequential. First, all the evidence before me indicates that Clearview made and maintained exact copies of the data from those Hard Drives. It is undisputed that Clearview paid $873,000 for the data. Thus, Clearview was strongly motivated to make complete and accurate copies, and Clearview presented evidence that it made such copies. (*See, e.g.*, Ton-That Witness Statement, ¶ 24 ("Mr. Kyler … created a comprehensive backup of the delivered drives"); Kyler Witness Statement, ¶ 10 ("I securely stored the ICI Delivered Drives in my home before securely and accurately copying their contents to an

---

[3] Clearview contends that it "wired $873,000 directly to Berlin's personal checking account" (*see, e.g.*, Cl. Pre-HB, pdf p. 2), but Berlin testified and provided evidence that the money was sent to an ICI account, not a personal account (*see* Hearing Transcript ("H. Tr."), 847:11-22).

industry-standard network-attached storage device").) No evidence indicated that Clearview lacked the technical expertise to make such copies. And respondents presented no credible evidence that would lead me to doubt the accuracy of the copies. Second, and more importantly, accessing the data on the original Hard Drives is not necessary to prove that ICI breached its obligations under the Term Sheet, as other evidence presented at the hearing established that the data supplied by ICI was insufficient.

93.    Thomas Marsh's testimony was fatal to ICI's defense, as it established that the data ICI delivered to Clearview did not come close to meeting the Term Sheet's requirements. Marsh is the CEO of Bintel Inc., the company ICI "hired … to create a database consisting of individuals' arrest records that were to be joined with photographs of the individuals and other available information about them." (Marsh Witness Statement, ¶¶ 1-2.) Marsh testified that he "personally worked on this project and [is] familiar with Bintel's work on this matter." (*Id.* at ¶ 2.) And as respondents argued in their post-hearing brief, "Mr. Marsh was the only fact witness at the hearing not employed by either of the parties. Nor did he have any 'dog' in the fight since there were (and are) no claims against Bintel, his company." (Resp. Post-HB, p. 9.) Moreover, Marsh testified that he "didn't have a copy of [the ICI-Clearview] agreement [and was not] briefed on the particulars of it." (H. Tr., 360:2-4; *see also* 371:8-13 (same); 375:25-376:3 ("the specifics of what was required at the deliverable was not made clear to us in terms of numbers"); 381:10-16 (did not know how many arrest records or photographs were owed to Clearview).) Thus, his testimony on the data ICI delivered to Clearview did not appear to be influenced by any knowledge of the contractual requirements.

94.    Marsh testified that in December of 2019 Bintel created a "10,000 record sample set … to make sure that what [they] were doing was going to work on Clearview's side". He

FINAL 2024-11-07

testified further that they sent the sample set to Clearview, who "approved it, ... so the delivery in February was done using the same approach." (H. Tr. 393:13-394:6.) Marsh said that the 10,000-record sample set reflected the best that could be derived from the data, explaining "at some point, your yield starts to drop". (H. Tr. 401:8-25.) When I asked him how many more joined datasets, similar in quality to the samples, he could produce, he responded:

> We did statistical analysis on the combinations and felt that, you know, there was -- I think one of the targets that might have been thrown out was around 10 or 15 million records and that that should have been achievable.

(H. Tr. 403:12-18; *see also* 404:11-405-19 (agreeing that the total would be 15 million or fewer).) In other words, Marsh was not even shooting for a target anywhere near the Term Sheet's requirement of "690 million arrest records and 390 million photos, fully joined".

95.    Nonetheless, respondents have argued that even if ICI breached the Term Sheet, ICI's breach should be excused because Clearview also breached the Term Sheet by failing to review the data and report any deficiencies to respondents. But the evidence belies that position, which is also undercut by respondents' own arguments. Ton-That testified that he notified Berlin immediately that the data was inadequate. (E.g. 86:5-7; 87:19-88:3.) Berlin, on the other hand, testified that "Clearview did not provide feedback until shortly before filing its arbitration demand." (Berlin Witness Statement, ¶ 36.) Although Clearview provided no documentary evidence to support Ton-That's position that he notified Berlin immediately, Clearview did supply documentary evidence that directly contradicts Berlin's position. Exhibits 46 and 47 show that by no later than June of 2021 (two years before Clearview commenced the arbitration), Clearview had informed respondents that the data supplied by ICI did not meet the Term Sheet's requirement.

FINAL 2024-11-07

96.     In any event, respondents' argument that Clearview should have given them
notice earlier – presumably so ICI could have cured any deficiencies – is undermined by
respondents' steadfast position that the data ICI provided to Clearview was adequate. Per the
uncontested facts, "[i]n October 2021, ICI sent Clearview a 'Compliance Presentation' in which
it claimed that the data it had provided was sufficient under the Agreement." (Paragraph 29.)
Moreover, Berlin testified that the Hard Drives ICI delivered to Clearview "complied with the
Term Sheet." (Berlin Witness Statement, ¶ 28.) Thus, after Clearview gave ICI notice of the
data's inadequacy, ICI refused to supplement it or fix the problems. Instead, it has repeatedly
taken the position that the supplied data complied with the Term Sheet's requirements.

97.     Turning to respondents' "adverse inference" argument, they assert that "[t]here is
no evidence that is more important to ICI's defense than the [Hard Drives] that were delivered in
accordance with the Term Sheet." (Resp. Post-HB, p. 17.) Thus, they conclude that "not only
should Clearview's testimony as to what was on the 'cloud' be stricken, ICI is entitled to an
inference that the [Hard Drives] complied with the Term Sheet, and dismissal of Clearview's
claims to the contrary." (Resp. Post-HB, p. 17.) But respondents' conclusion is based on a
misapplication of the law. As noted above, they support their argument by citing *Pegasus
Aviation I, Inc. v. Varig Logistica S.A.* But that case provides that "the party seeking spoliation
sanctions must establish that the destroyed documents were relevant to the party's claim or
defense". 26 N.Y.3d 543, 548; *see also* Resp. Post-HB, p. 17. Thus, even if respondents could
prove that Clearview was responsible for the missing Hard Drives – which they have not done –
they would still need to establish that the Hard Drives are relevant to their defense. They cannot
do that for at least two reasons discussed above. First, the Hard Drive did nothing but house
digital information, and the evidence suggests that Clearview made accurate copies of that

information. Second, Marsh's testimony establishes that ICI did not come close to meeting its

obligations under the Term Sheet. Thus, I have no reason to believe that the original Hard Drives

would provide me with any relevant evidence.

98.     The Term Sheet is a valid contract between Clearview and ICI. The evidence

shows that ICI breached its obligation to provide Clearview the "Data" required under the Term

Sheet. Thus, ICI is liable to Clearview for the damages Clearview suffered because of that

breach.

99.     In its post-hearing brief, Clearview argues that "Berlin is also personally liable for

breach of contract." (Page 13.) In support of that argument, Clearview claims that "Berlin

*personally* signed the contract … [and] *personally* performed under it". (*Id.*, italics in original.)

But the first claim is false and the second is irrelevant. Berlin signed the Term Sheet (Exhibit 7)

using DocuSign, which identifies the signature as being that of "Donald Marshall Allan Berlin,

… Investigative Consultants, Inc., … Office of the CEO". Thus, I conclude that Berlin signed the

Term Sheet in his capacity as CEO of ICI, not in his personal capacity. And Clearview's claim

that Berlin "personally performed" under the Term Sheet is a red herring, as corporations

obviously perform under contracts through the actions of human beings. Surely Clearview does

not intend to suggest that every corporate employee, officer, director, or owner becomes

personally liable under a contract simply by performing some of the corporations' obligations

under that contract. In any event, Clearview provides no authority to support that position.

100.     Clearview also argues that because of his counterclaim under the Term Sheet,

Berlin is "judicially estopped from arguing that he is not a personal party to the Agreement",

*citing New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) and *Sheppard v. East*, 192 S.W.3d

518, 524 (Mo. Ct. App. 2006). But the cited authority does not support Clearview's position. In

INDEX NO. 659836/2024
RECEIVED NYSCEF: 12/23/2024
Case 1:25-cv-00049-JPO   Document 1-6   Filed 01/03/25   Page 31 of 69

FINAL 2024-11-07

*New Hampshire*, a U.S. Supreme Court case, Justice Ginsberg explains that judicial estoppel

prevents a party who asserted and *succeeded* on a position in a *prior* legal proceeding from

asserting a "clearly inconsistent" position in a subsequent proceeding (p. 50). She explains

further that "[a]bsent success in a prior proceeding, a party's later inconsistent position

introduces no "risk of inconsistent court determinations". *Id.* at 750-751. Since Berlin's

counterclaim was neither successful nor in a prior proceeding, Clearview's authority is

inapplicable.

101.    Accordingly, Berlin could be liable for ICI's breach of the Term Sheet only under

an alter-ego theory, which I discuss, and reject, below.

102.    I grant Clearview relief (as discussed below) under Am. SOC, Count I.

### 2.  Damages:

103.    Clearview contends that its damages related to the above breach go well beyond

the $873,000 that Clearview paid for the deficient data. In addition to that amount, Clearview is

seeking $3,070,000 in consequential damages. But Clearview has not established either a factual

or legal basis for its consequential damages claim.

104.    Under New York law, to recover consequential damages a plaintiff must show

that those damages were "brought within the contemplation of the parties as the probable result

of a breach at the time of or prior to contracting". *Kenford Co., Inc. v. County of Erie*, 73 N.Y.2d

312, 319 (1989). Moreover, "proof of consequential damages cannot be speculative or

conjectural". *Bi-Economy Market, Inc. v. Harleysville Ins. Co. of New York*, 856 N.Y.S.2d 505,

508 (2008). Rather, such "damages … must be proven with reasonable certainty and be capable

of measurement based upon known reliable factors without undue speculation". *Id.* (cleaned up).

105.    Per the report of Clearview's expert, O'Connell, the $3,070,000 "is an estimate in

the reduction of Clearview's enterprise value as a result of the breach of contract." (Page 7.)

FILED: NEW YORK COUNTY CLERK 12/23/2024 03:57 PM
NYSCEF DOC. NO. 6

INDEX NO. 659836/2024
RECEIVED NYSCEF: 12/23/2024

Case 1:25-cv-00049-JPO    Document 1-6    Filed 01/03/25    Page 32 of 69

FINAL 2024-11-07

First, Clearview offered no evidence that this type of damages was "brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting". *Kenford Co., Inc.* at 319. Thus, as a matter of law, Clearview may not recover such damages.

106.    Second, Clearview's support for its calculation of consequential damages is speculative and conjectural. Clearview's Expert's Report states, "[t]he Company raised capital in 2019 and the breach occurred when the Company gave benefits of $873,000 to the investor for a database which was going to improve sales, but was not delivered." (*Id.,* p. 8.) This explanation of the transaction is confused at best. The report then notes: "The $873,000 was 14% of the capital raised. This amount was to be used to grow revenues." (*Id.*) And finally, the report provides its basis for calculating damages: "This model assumes sales and gross profits would grow proportionately to the 14% of cash available." (*Id.*)

107.    O'Connell's testimony at the evidentiary hearing was confused and unhelpful to Clearview's claim for consequential damages. He revealed his complete misunderstanding of the transaction at issue, repeatedly testifying that he understood Clearview was supposed to *receive* $873,000 for a database. *See, e.g.,* H. Tr. 579:12-17 ("my understanding is the company did not receive $873,000 for a database of photos"); 589:7-10 ("The company Clearview was to receive 800 – and whatever it was -- 73,000 that they didn't receive."); 590:22-23 ("They were to receive $873,000 for a database"); 601:5-8 ("It's my understanding that the company, Clearview, was to receive $873,000 for the data"); 601:12-22 (same confusion). More importantly, O'Connell essentially admitted that his consequential damages calculation was speculative. As noted above, he simply assumed that "gross profits would grow proportionately to … cash available". (Cl. Ex.

Rep., p. 8.) But he admitted that he never tested to see if there was a correlation between the amount of cash Clearview had on hand and its sales. H. Tr., 629:13-17.

108.    Thus, Clearview failed to prove it is entitled to consequential damages, so ICI is liable under Am. SOC, Count I for Clearview's out-of-pocket damages of $873,000, plus interest, but is not liable for any consequential damages.

### 2. Am. SOC, Count II – "Breach of Contract with Respect to Exclusivity"

#### i. Questions presented:

109.    Did ICI breach the "Exclusivity" provision of the Term Sheet, which provides that ICI "may not sell a similar dataset to any private company which offers facial recognition technology, biometrics or security services for 3 years."

110.    If ICI breached the "Exclusivity" provision of the Term Sheet, how (if at all) was Clearview damaged?

#### ii. Discussion:

111.    As noted above, the elements of breach of contract are "the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of its contractual obligations, and damages resulting from the breach." *Pare* at 373.

112.    Clearview did not present sufficient evidence to establish that ICI breached the "Exclusivity" provision of the Term Sheet. Indeed, although Clearview alleged the claim "on information and belief" (Am. SOC, ¶¶ 31, 49), it was unable to point to any information on which it based its belief (*see, e.g.*, Ton-That testimony, H. Tr. 122:21 – 122:24 (Clearview's CEO could not identify any support for the claim). Instead, Clearview attacked Berlin's character, attempting to show that he was the type of person who would likely breach such a clause. (*See, e.g., id.* at 36 ("Berlin's long history of criminal activity and duplicity also creates a

FINAL 2024-11-07

strong inference that he breached the exclusivity clause".) Thus, I deny Clearview relief under

Am. SOC, Count II.

113.    Since Clearview did not prove a breach of the "Exclusivity" provision of the

Term Sheet, I need not address damages on that claim.

### 3.  Am. SOC, Count III – "Fraudulent Inducement"

#### i.  Questions presented:

114.    Are respondents liable for fraudulently inducing Clearview to sign the Term

Sheet?

115.    If respondents fraudulently induced Clearview to sign the Term Sheet, is

Clearview entitled to compensatory, consequential, and punitive damages, as well as equitable

remedies – in addition to the damages I am awarding in connection with Clearview's breach of

contract claim?

#### ii.  Discussion:

116.    Under New York law, "[i]t is axiomatic that a cause of action for fraud does not

arise where … the fraud alleged relates to a breach of contract". *Egan v New York Care Plus Ins.*

*Co.*, 277 A.D.2d 652, 653 (2000) (citation omitted). "Thus, absent a legal duty owed to plaintiff

by defendants, independent of that encompassed by the contract, plaintiff's causes of action

grounded on fraud are not cognizable". *Id.* (citation omitted). "Moreover, it is well settled that a

claim arising out of an alleged breach of contract may not be converted into a tort action absent

the violation of a legal duty independent of that created by the contract". *Rothberg v Reichelt*,

270 A.D.2d 760, 762 (2000) (cleaned up and citations omitted). And the "legal duty must spring

from circumstances extraneous to, and not constituting elements of, the contract". *Id.* at 763

(citations omitted).

117.    Here, Clearview's fraud claims are inextricably intertwined with its breach of

contract claims. All Clearview's claims are based on ICI's *contractual* duties set forth in the

Term Sheet – most importantly, the duty to provide Clearview with "690 million arrest records

and 390 million photos, fully joined, and quality tested" and to ensure that the "[a]rrest

information include[d] (at minimum): Name, State, Present and Past Address, SSN, DOB, Photo,

Charges, Cell Phone or Home Phone, Email Address".

118.    Since Clearview has not proved that either respondent owed it "a legal duty …

independent of that encompassed by the [Term Sheet, Clearview's] causes of action grounded on

fraud are not cognizable". *Egan* at 653.

119.    In its post-hearing brief, Clearview argues that "Berlin is liable for fraudulent

inducement because *he personally* fraudulently induced Clearview to enter into the Agreement."

(Page 11 (italics in original).) But that argument assumes the conclusion that Berlin was acting in

his personal capacity rather than in his capacity as ICI's CEO. Clearview does not support that

assumption with any evidence. Nor does it provide legal authority supporting its position that

Berlin should be held personally liable.

120.    Since Clearview did not prove a valid cause of action for fraudulent inducement

against either respondent, I need not address damages on that claim. I deny Clearview any relief

under Am. SOC, Count III.

### 4. Am. SOC, Count IV – "Fraudulent Misrepresentation and Concealment"

#### i. Questions presented:

121.    Are respondents liable to Clearview for fraudulent misrepresentation and

concealment?

122.    If respondents are liable for fraudulent misrepresentation and concealment, is

Clearview entitled to compensatory, consequential, and punitive damages, as well as equitable

Case 1:25-cv-00049-JPO    Document 1-6    Filed 01/03/25    Page 36 of 69

FINAL 2024-11-07

remedies – in addition to the damages I am awarding in connection with Clearview's breach of contract claim?

### ii. Discussion:

123.    For all the reasons discussed above, Clearview's causes of action grounded on fraud are not valid against either respondent. *See id.* ("absent a legal duty owed to plaintiff by defendants, independent of that encompassed by the contract, plaintiff's causes of action grounded on fraud are not cognizable").

124.    Since Clearview did not prove a valid cause of action for fraudulent misrepresentation and concealment, I need not address damages on that claim. I deny Clearview any relief under Am. SOC, Count IV.

### 5. Am. SOC, Count V – "Unjust Enrichment"

#### i. Questions presented:

125.    Are respondents liable to Clearview for unjust enrichment?

126.    If respondents are liable for unjust enrichment, is Clearview "entitled to restitution and disgorgement for ICI's unjust enrichment from its fraud and breaches" (as alleged in Am. SOC, ¶ 68) – in addition to the damages I am awarding in connection with Clearview's breach of contract claim?

#### ii. Discussion:

127.    Under New York law, "[u]njust enrichment is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Brockington v. Dollar Gen. Corp.*, No. 1:22-CV-06666 (LJL), 2023 WL 6317992, at *17 (S.D.N.Y. Sept. 28, 2023) (citation omitted). Where "[a]ll of the claims … are based on the same

FILED: NEW YORK COUNTY CLERK 12/23/2024 03:57 PM
NYSCEF DOC. NO. 6

INDEX NO. 659836/2024
RECEIVED NYSCEF: 12/23/2024

Case 1:25-cv-00049-JPO    Document 1-6    Filed 01/03/25    Page 37 of 69

FINAL 2024-11-07

alleged misrepresentation[, an] unjust enrichment claim [must be] dismissed as duplicative." *Id.*
(quotation omitted).

128.    Here, Claimant's unjust enrichment claim is a duplicative repackaging of its
breach of contract and fraud claims. That repackaging is apparent from the plain language of the
Amended Statement of Claim, where (as noted above) Clearview claims, "upon information and
belief" that respondents breached the exclusivity provisions of the Term Sheet and alleges that
"[i]t would be unjust and inequitable for the ICI Respondents to retain the proceeds of their fraud
and breach or breaches of the Term Sheet's Exclusivity provision" or to "retain their proceeds
from their other fraudulent acts and breaches …, including the funds they received from
Clearview under the Term Sheet." In other words, Claimant alleges that respondents were
unjustly enriched because they breached the Term Sheet, so the claims are directly duplicative.

129.    In their post-hearing brief, Claimants also argued that "Berlin is … personally
liable for unjust enrichment, as he was the party that was unjustly enriched by Clearview's
payment of $837,000 under the Agreement", citing *Castellotti v. Free*, 138 A.D.3d 198 (2016).
But the *Castellotti* facts are far different from the facts in this case. *See id., passim* (concerning
an intra-family dispute over an estate, where there was no written contract). *Castellotti* has
nothing to do with holding a corporate officer personally liable under a corporation's contract.
*See id.* Unlike in *Castellotti,* Clearview is attempting to repackage its alter ego claim as an unjust
enrichment claim, which could allow it to avoid the high bar of alter-ego liability. New York law
does not permit that sort of repackaging. *See Brockington* at *17.

130.    Accordingly, Clearview's unjust enrichment claim is duplicative, and thus is not
valid against either respondent.

131.    Since Clearview did not prove a valid cause of action for unjust enrichment, I need not address damages on that claim. I deny Clearview any relief under Am. SOC, Count V.

### 6. Clearview's "Alter Ego" Claim against Berlin

#### i. Question presented:

132.    Is Berlin ICI's alter ego and thus liable to Clearview to the same extent as ICI?

#### ii. Discussion:

133.    In paragraph 4 of it Amended Statement of Claim, Clearview alleges: "Upon information and belief, ICI is an alter ego of its owner, President, and only known employee, Mr. Donald Berlin. The known addresses associated with the company are a business mailing address and a residence owned by Mr. Berlin." There are no other allegations in the Amended Statement of Claim focused on Clearview's alter-ego theory. Clearview does, however, focus on the issue in its pre-hearing and post-hearing briefs (pdf pp. 37-39 and 14-18, respectively).

134.    In determining whether to pierce the corporate veil, New York courts apply the law of the corporation's state of incorporation. *See Flame S.A. v. Worldlink Int'l (Holding) Ltd.*, 967 N.Y.S.2d 328, 331 (1st Dep't 2013). In its pre-hearing brief, Clearview argues that "ICI is incorporated in Virginia, so Virginia law applies." (pdf p. 38.) But in its Amended Statement of Claim, Clearview alleges that ICI is "an Illinois corporation". (Paragraph 1.) And in its post-hearing brief, Clearview cites New York law in its alter-ego section, while citing documents apparently filed with the Illinois Secretary of State and the Virginia State Corporation Clerk's Information System. (Pages 14-18.)

135.    Respondents do not address the issue of ICI's state of incorporation. But in any event, regardless of the applicable state law, Clearview cannot deny that the bar for disregarding the corporate form is high. For example, in one case Clearview cited, the Virginia Supreme Court "stated that the proposition is elementary that a corporation is a legal entity entirely

separate and distinct from the shareholders or members who compose it" and goes on to explain that "immunity of stockholders is a basic provision of statutory and common law and supports a vital economic policy underlying the whole corporate concept." *C.F. Trust, Inc. v. First Flight L.P.*, 266 Va. 3, 9 (2003) (cleaned up). "The decision to ignore the separate existence of a corporate entity and impose personal liability upon shareholders for debts of the corporation is an extraordinary act to be taken only when necessary to promote justice." *Id.* at 10.

136. Another Virginia Supreme Court case cited by Clearview explains that alter-ego liability generally requires proof "that the shareholder sought to be held personally liable has controlled or used the corporation to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage." *O'Hazza v. Executive Credit Corp., 246 Va. 111, 120* (1993).

137. Clearview did not prove any of those things – at least not to the extent required to clear the high bar necessary to pierce the corporate veil. In its post-hearing brief, Clearview relies heavily on arguments and documents that it did not submit at the hearing. Clearview argues that "ICI failed to file annual statements with the Secretary of State for many years, including … 2019 and 2020 when the Agreement was signed and allegedly being performed." (Page 15, fn. 9, citing a web page on the official website of the Illinois Secretary of State.) It also claims that "ICI was even temporarily dissolved in May 2024". (*Id.*, fn. 11, again citing a document allegedly produced by the Illinois Secretary of State.)

138. In addition, Clearview argues that "ICI … remains 'Not in Good Standing' and 'Pending Inactive' with the Secretary of State." (*Id.*, fn. 10, citing a "virginia.gov" web page with the caption, "State Corporation Commission Clerk's Information System".) But when I

FINAL 2024-11-07

checked the last cited resource, it showed ICC's "Entity Status" as "Active" and its "Reason for

Status" as "Active and In Good Standing".

139.    Clearview also argues that I "may take judicial notice of ICI's corporate

documents filed with the Secretary of State as though they were cited in caselaw." (*Id.,* citing

CPLR 4511(b); *Brandes Meat Corp. v Cromer*, 146 A.D.2d 666, 667 (N.Y. App. Div. 1989); and

*Munaron v. Munaron*, 862 N.Y.S.2d 796, 797 (Sup. Ct. 2008).) But even assuming that

argument is true, it does not change the fact that Clearview had the opportunity to introduce the

above documents and resources into evidence at the hearing and failed to do so, thus denying

respondents (and me) the opportunity to challenge or otherwise respond to them.

140.    Moreover, even if I were to consider the referenced corporate documents in the

light most favorable to Clearview, they would provide only one piece in the complex puzzle

necessary to establish that Berlin should be held liable as ICI's alter ego. In sum, Clearview has

not proved that I should take the extraordinary action of ignoring the separate corporate existence

of ICI and imposing personal liability upon Berlin. I deny Clearview any relief against Berlin

under its alter-ego theory.

### 7.  Respondents' Counterclaim – "Breach of Contract"

#### i.  Questions presented:

141.    Did Clearview breach its obligation to pay ICI at total of $918,000 under the

Term Sheet?

142.    If Clearview breached its obligation to pay ICI at total of $918,000 under the

Term Sheet, how (if at all) were respondents damaged?

#### ii.  Discussion:

143.    To establish that Clearview is liable to respondents under the counterclaim,

respondents would have needed to prove "the existence of a contract, [ICI]'s performance

pursuant to the contract, [Clearview]'s breach of its contractual obligations, and damages resulting from the breach." *Pare v. Aalbue*, 202 N.Y.S.3d 368, 373 (N.Y. App. Div. 2023) (citations omitted).

144.    ICI presented no evidence to support either liability or damages on this counterclaim. Thus, it failed to prove the elements set forth above, so I am denying respondents' counterclaim in full.

### 8.  Costs and Fees

#### i.  Questions presented:

145.    Is any party entitled to an award of its costs and fees?

146.    If any party is entitled to an award of its costs and fees, how much should be awarded?

#### ii.  Discussion:

147.    Both sides requested that I award costs and fees (*see* Am. SOC, p. 25 (requesting "Attorneys' fees, costs, and expenses associated with this action" and Counterclaim, p. 8 ("Clearview should be required to pay the costs of the arbitration as well as Respondents' costs and a reasonable attorneys' fee"). Thus, an award of costs and fees is appropriate under the AAA Rules. *See, e.g.*, Rule R-49(d) ("The award of the arbitrator may include … an award of attorneys' fees if all parties have requested such an award").

148.    Also, as discussed above, PO-12 provides in part for an award of costs:

> 1. As a part of the final award in this case, I will award claimant its costs and expenses associated with respondents' failure to comply with my orders related to the submission of:
>
> > i. exhibits for the evidentiary hearing;
> >
> > ii. the joint statement of uncontested facts;
> >
> > iii. the joint testimonial roadmap;

FINAL 2024-11-07

iv. an agreed date for the final pre-hearing conference; and

v. the stipulated agenda for that conference.

2. Both sides shall have the opportunity to brief this issue, including quantifying costs, in their post-hearing briefs.

Notwithstanding the foregoing order, neither side took advantage of the opportunity I granted them to brief the issue. In its post-hearing brief, ICI presented no arguments in support of limiting its liability under PO-12. And Clearview did not quantify its costs related to respondents' failure to comply with my orders relating to the submissions listed above.

149.    In a general sense, Clearview is the prevailing party in this arbitration, as it proved that ICI failed to comply with its primary obligation under the Term Sheet. But I cannot overlook the fact that Clearview unsuccessfully pursued four other causes of action and failed to prove that Berlin is personally liable. Nor can I ignore the fact that respondents failed to prove their counterclaim. I am confident that the costs and fees Clearview incurred pursuing its unsuccessful claims (and defeating respondents' counterclaim) overlapped at least somewhat with the costs and fees it incurred pursuing its successful claim. But I am equally confident that the arbitration would have been more efficient and economical if Clearview had pursued only its viable claim. Plus, ICI is liable to Clearview for certain costs and fees under PO-12, Thus, I am awarding Clearview one-half of its total costs and fees.

150.    This raises the question of who is liable for these costs and fees. Per PO-4, I determined that Berlin is properly a party to this arbitration, and he undoubtedly participated in the proceedings in a way that increased costs and fees, including participating in the events that led to my costs order in PO-12. But I have determined that Berlin is not personally liable. Thus, he prevailed on Clearview's affirmative claims. He lost, however, on the counterclaim.

Accordingly, Berlin is personally liable, jointly and severally with ICI, for twenty-five percent of Clearview's costs and fees.

151.    Per the Fee and Cost Declaration of Collin J. Vierra (attached hereto as Addendum 4), Clearview's total legal fees in this case were $401,328 and its total costs were $113,947.71, for a grand total of $515,275.71. As noted above, I am awarding Clearview one-half of that amount, equalling $257,637.86. Berlin is jointly and severally liable for twenty-five percent of that amount, so respondents' costs and fees liability are:

    a.  ICI: $193,228.39

    b.  ICI and Berlin, jointly and severally: $64,409.47

## H.  AWARD

152.    For the reasons set forth above, I hold:

    i.   ICI shall pay Clearview compensatory damages of $873,000 (the "Damages") by no later than December 7, 2024.

    ii.  ICI shall pay Clearview interest on the Damages at the rate of 9% per annum from August 1, 2019 through the payment date. I am assuming a 365-day year, so the daily interest is $215.26 for as long as the full balance of Damages is outstanding.

    iii. ICI shall pay Clearview $193,228.39 in costs and fees ("Costs"), plus interest, by no later than December 7, 2024.

    iv.  ICI shall pay Clearview interest on the Costs at the rate of 9% per annum from the date of this Award through the payment date. I am assuming a 365-day year, so the daily interest is $47.65 for as long as the full balance of Costs is outstanding.

    v.   ICI and Berlin are jointly and severally liable to Clearview for $64,409.47 in costs and fees ("Joint-and-Several Costs"), so jointly or severally they shall pay Clearview $64,409.47, plus interest, by no later than December 7, 2024.

    vi.  ICI and Berlin are jointly and severally liable to Clearview for interest on the Joint-and-Several Costs at the rate of 9% per annum from the date of this Award through the payment date, so jointly or severally they shall pay such interest to Clearview. I am assuming a 365-day year, so the daily interest is $15.88 for as long as the full balance of Joint-and-Several Costs is outstanding.

Case 1:25-cv-00049-JPO    Document 1-6    Filed 01/03/25    Page 44 of 69

FINAL 2024-11-07

    vii.    Clearview's requests for consequential damages, punitive damages, restitution, disgorgement, rescission, and any other relief are all denied in full.

    viii.    Respondents' claims for damages, costs, attorneys' fees, or any other relief are all denied in full.

    ix.    Any claims not specifically addressed herein are denied in full.

    x.    Any relief not specifically awarded herein is denied in full.

    xi.    This is a final award, disposing of all claims.

Dated: November 7, 2024

Signed In: Brooklyn, New York

Usher Winslett, sole arbitrator

FILED: NEW YORK COUNTY CLERK 12/23/2024 03:57 PM
NYSCEF DOC. NO. 6

INDEX NO. 659836/2024
RECEIVED NYSCEF: 12/23/2024

**FINAL 2024-11-07**

# Addendum No. 1

**AMERICAN ARBITRATION ASSOCIATION**

**Commercial Arbitration Rules**

**Procedures for Large, Complex Commercial Disputes**

| | |
|---|---|
| **CLEARVIEW AI, INC.,** | |
| **Claimant,** | **AAA Case No. 01-23-0002-6322** |
| **v.** | **Arbitrator: Usher Winslett** |
| **INVESTIGATIVE CONSULTANTS, INC. and DONALD BERLIN,** | |
| **Respondents.** | |

## <u>ORDER NO. 4 – DENYING DONALD BERLIN'S MOTION TO DISMISS</u>

**I.     Introduction:**

Respondent Donald Berlin ("Berlin") has made a motion seeking an order dismissing

him from this arbitration, arguing, among other things, that (i) he is not a party to the

arbitration agreement on which this proceeding is based, and (ii) Claimant Clearview AI Inc.

("Clearview") has alleged no facts to support its conclusion that Respondent Investigative

Consultants, Inc. ("ICI") is Berlin's alter ego.[1] Clearview opposes the motion, arguing, among

other things, that Berlin consented to arbitral jurisdiction by participating in the arbitration

from the beginning, including participating in a preliminary hearing, negotiating and agreeing

to the procedural order for the arbitration, negotiating and agreeing to the protective order for

the arbitration, filing letter briefs, answering Clearview's claims, asserting a counterclaim

against Clearview, and serving discovery requests on Clearview. Clearview also argues that it

has properly alleged that ICI is Berlin's alter ego, which Clearview asserts make Berlin

---

[1] In support of his motion, Berlin filed a brief dated November 13, 2023 ("Berlin Br."), and in reply to Clearview's opposition, Berlin filed a reply brief dated December 6, 2023 ("Berlin Reply").

Case 1:25-cv-00049-JPO        Document 1-6        Filed 01/03/25        Page 47 of 69

subject to arbitral jurisdiction.[2]

## II.    Order:

Pursuant to Rule R-7, of the Commercial Arbitration Rules of the American

Arbitration Association effective September 1, 2022 (the "Rules"), I deny Berlin's motion. For

the reasons discussed below, he is properly a party to this arbitration and subject to my

jurisdiction as arbitrator.

## III.   Reasoning:

### A.    Overview of Arguments:

The contract at issue in this arbitration is a term sheet dated July 30, 2019 (the "Term

Sheet"), which contains an arbitration clause. In his motion, Berlin asserts that he is not a

signatory to the arbitration agreement in his personal capacity and explains that he signed the

Term Sheet in his capacity as the President of ICI. (Berlin Br., p. 3.) Clearview does not

contest that assertion. (Clearview Opp., *passim*.) Rather, Clearview argues:

> Berlin is subject to arbitral jurisdiction for several independent
> reasons: (1) he expressly waived his right to contest arbitral
> jurisdiction; (2) he expressly assumed an obligation to arbitrate; (3)
> he is judicially estopped from contesting arbitral jurisdiction; (4)
> he is prohibited by direct-benefit estoppel from contesting arbitral
> jurisdiction; (5) Clearview plausibly alleges that ICI is his alter ego
> …

(*Id.*, pp. 4-5.)

Berlin also asserts that although he participated in the arbitration under Clearview's

original statement of claim, Clearview's amended statement of claim renders the original

statement of claim a nullity, essentially erasing all his prior participation in the arbitration.

---

[2] In opposition to Berlin's motion, Clearview filed an opposition brief dated November 20, 2023
("Clearview Opp.").

Case 1:25-cv-00049-JPO    Document 1-6    Filed 01/03/25    Page 48 of 69

(Berlin Br., pp. 2-3.) In response, Clearview argues that an amended statement of claim does not provide a new opportunity to contest arbitral jurisdiction. (Clearview Opp., pp. 10-12.)

**B.    Uncontested Facts:**

Clearview initiated this arbitration against ICI and Berlin on June 12, 2023. In response to Clearview's claims, on June 30, 2023, ICI and Berlin jointly filed an answer, affirmative defenses, and a counterclaim. Berlin did not contest arbitral jurisdiction in either the answer or the affirmative defenses.

On September 1, 2023, counsel for ICI and Berlin participated in a preliminary hearing without asserting any objection to arbitral jurisdiction over Berlin. On September 9, 2023, I sent counsel for Clearview, ICI, and Berlin a draft of Procedural Order No. 1, which contained the following provision in Paragraph 1: "**Arbitrability and Jurisdiction:** The parties do not contest the arbitrability of the claims asserted in the arbitral proceedings or the Arbitrator's jurisdiction over such claims." (Bolding in original.) That draft also contained the following provision in Paragraph 5: "**Claims/Counterclaims:** By agreement of the parties, the deadline to amend claims, counterclaims, or defenses is **October 16, 2023**." (Bolding in original.) In my cover email to counsel, I instructed them to "review [the draft Procedural Order] carefully", and I set forth the procedure we would follow "[i]f either side disagrees with any element of the draft Order". The parties had ample time to review the draft Order. Indeed, counsel for both sides revised it and exchanged redlines before agreeing on the final version. The final version that all parties (including Berlin) agreed to contains the above provisions on arbitrability and jurisdiction and amendments. I signed Procedural Order No. 1 on October 2, 2023 with the consent of all parties.

In its opposition brief, Clearview asserts: "On August 7, 2023, ICI and Berlin served 16

Case 1:25-cv-00049-JPO    Document 1-6    Filed 01/03/25    Page 49 of 69

interrogatories and 11 requests for production on Clearview. Clearview has answered each of these discovery requests and produced approximately 700 pages of documents to Berlin in response to them." (Clearview Opp., p. 3.) Berlin does not contest that assertion in the Berlin Reply.

Between September 5, 2023 and September 19, 2023, counsel for all parties, including Berlin, exchanged redlines of a draft protective order. I also made edits, and counsel for all parties (including Berlin) approved the final version, which I signed on September 21, 2023. In its opposition brief, Clearview asserts that "Clearview provided its discovery to Berlin pursuant to the protective order." Berlin does not contest that assertion in the Berlin Reply.

On October 18, 2023, Clearview served and filed its amended statement of claim.[3]

On October 25, 2023, Berlin sought leave to file a motion to dismiss all of Clearview's claims against him. On October 30, 2023, Clearview submitted a response to Berlin's request. After some further email exchanges, on November 3, 2023, I granted Berlin leave to file his motion to dismiss. On November 13, 2023, Berlin submitted the motion, which Clearview opposes.

## C.    Analysis:

It is undisputed that I have the authority to decide this issue. Rule R-7(a) provides: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." Berlin and Clearview both acknowledge that power in their respective briefs. *See* Berlin Br., p.4, fn. 1 ("Since the matter already is in the

---

[3] Although Procedural Order No. 1 provided for an October 16 deadline, the parties agreed to a brief extension and informed me by email.

hands of the arbitrator, the arbitrator can and should decide the issue itself.); *see also* Clearview Opp., p. 4 ("The Arbitrator has the power to determine that this matter should proceed against Berlin in his personal capacity.")

Per the arbitration clause in the Term Sheet, New York law applies to this dispute. Moreover, Procedural Order No. 1 provides that the Rules, the Federal Arbitration Act, and New York law all apply.

The Second Circuit has identified five instances where a nonsignatory "may be bound to the arbitration agreements of others: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Absolute Nevada, LLC v. Grand Majestic Riverboat Co., LLC*, 646 F. Supp. 3d 426, 435 (S.D.N.Y. 2022) (internal quotations and citations omitted). Clearview has argued a variation of most of the above theories. Based on the undisputed facts outlined above, I have concluded that Berlin is bound by the arbitration clause under the assumption theory and that he is estopped from denying his obligation to arbitrate, so it is unnecessary to address the other three instances listed above – or any other arguments presented by Clearview.

As discussed in *Absolute Nevada,* "[a]n agreement to arbitrate can be implied from a party's conduct in the arbitration proceedings." *Id.* That court went on to explain that "[w]hen a nonsignatory "participates in arbitration proceedings without making a timely objection to the submission of the dispute to arbitration, that party may be found to have waived its right to object to the arbitration." *Id.* The court then gave several examples of actions that "manifested a clear intent to arbitrate the dispute" (*id.*), including: (1) selecting counsel to appear in the arbitration (*id.*), (2) not objecting to the process, refusing to arbitrate, or seeking judicial relief (*id.*), and (3) actively participating in the arbitration process for months before challenging

arbitrability (*id.* at 436).

All of those examples apply here. As discussed above, counsel appeared on Berlin's behalf from the beginning of this arbitration. Through that counsel, ICI and Berlin jointly filed an answer, affirmative defenses, and a counterclaim. Berlin did not contest arbitral jurisdiction in either the answer or the affirmative defenses. Later, counsel for Berlin participated in a preliminary hearing without asserting any objection to arbitral jurisdiction over Berlin. Then, Berlin had ample opportunity to review (and object to) a draft of Procedural Order No. 1, which specifically provided that the "parties do not contest the arbitrability of the claims asserted in the arbitral proceedings or the Arbitrator's jurisdiction over such claims." That draft also contained a provision allowing the parties to amend claims, counterclaims, or defenses. Moreover, Berlin does not contest Clearview's assertion that Berlin participated in – and derived benefit from – the arbitration process by serving 16 interrogatories and 11 requests for production on Clearview. Nor does he deny that Clearview has answered each of those discovery requests and produced approximately 700 pages of documents. This is exactly the type of conduct that implies an agreement to arbitrate and constitutes a waiver of the right to object to the arbitration. *See, e.g., id.* at 435-436.

Also, Berlin is estopped from denying his obligation to arbitrate, as he has received a "direct benefit" from the contract containing the arbitration clause. *See American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2nd Cir. 1999). For example, Berlin has derived a "direct benefit" derives from the arbitration clause itself, as he participated in the drafting of a protective order covering the information exchange in this arbitration, and he does not dispute that he received documents and information pursuant to that protective order and otherwise participated in discovery.

Clearview's filing of an amended statement of claim does not erase Berlin's prior participation in the arbitration or negate the direct benefit he has derived from that participation. Through his counsel's review and approval of my proposed draft of Procedural Order No. 1, Berlin consented to "the arbitrability of the claims asserted in the arbitral proceedings [and] the Arbitrator's jurisdiction over such claims." He also consented to the parties' right to "amend claims, counterclaims, or defenses".

For all the foregoing reasons, I deny Berlin's motion to dismiss. But for the sake of clarity, nothing contained herein prejudices any non-jurisdictional arguments Berlin may wish to make at the evidentiary hearing, including arguments regarding alter ego liability.

Dated: 2024-02-26
Signed in Brooklyn, New York

Usher Winslett, sole arbitrator

Case 1:25-cv-00049-JPO     Document 1-6     Filed 01/03/25     Page 53 of 69

FINAL 2024-11-07

# Addendum No. 2

**AMERICAN ARBITRATION ASSOCIATION**

**Commercial Arbitration Rules**

**Procedures for Large, Complex Commercial Disputes**

| | |
|---|---|
| **CLEARVIEW AI, INC.,** | |
| Claimant, | |
| v. | **AAA Case No. 01-23-0002-6322** |
| **INVESTIGATIVE CONSULTANTS, INC., et al.,** | **Arbitrator: Usher Winslett** |
| Respondents. | |

**PROCEDURAL ORDER NO. 12**

### I.  Background

On June 21, 2024, claimant's counsel, Collin Vierra, sent to respondents' counsel, the AAA, and me drafts of claimant's proposed statement of undisputed facts and testimonial roadmap. At the same time, Mr. Vierra sent a Google Drive link to claimant's proposed exhibits for the evidentiary hearing.

On July 7, 2024, in response to an application from respondents and over the objection of claimant, I issued PO-11 which, among other things, postponed the evidentiary hearing for the second time and ordered counsel to meet and confer on July 8, 2024 to agree on rescheduled dates. Specifically, PO-11 provides in pertinent part:

> 2.      Counsel *shall meet and confer* on July 8, 2024 to agree on rescheduled dates for:
>
> a.      The evidentiary hearing (the parties should agree on at least two options and present them to me);
>
> b.      Claimant's submission of a supplemented pre-hearing brief;
>
> c.      Respondents' submission of Donald Berlin's witness statement;
>
> d.      Claimant's supplements to the witness statements it previously submitted;

INDEX NO. 659836/2024

Case 1:25-cv-00049-JPO     Document 1-6     Filed 01/03/25     Page 55 of 69

e.   The *parties'* submission of the *stipulation* of
     uncontested facts;

f.   The *parties'* submission of a testimonial roadmap,
     *as described in paragraph 17(d) of PO-1*;

g.   The *parties'* submission of *joint exhibits* and
     contested exhibits, *as described in paragraph 16(a)
     and (b) of PO-1.*

3.   If counsel are unable to agree on dates for any of the above,
     they shall inform me on July 8, 2024, and I shall hold a
     Zoom conference with counsel on July 9, 2024 at 2pm ET.

(Emphasis added.) Accordingly, PO-11, coupled with PO-1, made it perfectly clear that

counsel would need to meet and confer – and agree on – among other things:

- the stipulation of uncontested facts;

- an agreed testimonial roadmap, as described in paragraph 17(d) of PO-1; and

- a set of joint exhibits.

As of the date of this order, I have received none of the above.

On July 9, 2024, I received an email from respondents' counsel, stating (in part):

> **The hearing shall begin on Monday, August 19 in New
> York and is expected to take three days (Collin please
> confirm).**
>
> By **Monday, August 5, 2024**, ICI shall submit all
> documents required by the Scheduling Order that have not yet been
> submitted and will confer with Clearview to update or submit joint
> documents. So, all pretrial documents are to be filed with the
> Arbitrator and AAA on or before **Monday, August 5. [sic] 2024**.
>
> Clearview has already been permitted to supplement
> documents that should have been filed simultaneously but were not
> filed by ICI. Clearview may file any supplemental documents by
> **Monday, August 12, 2024**.

(Bolding in original.) Thus, respondents' counsel confirmed their understanding that they were

obligated to "confer with Clearview", to "submit joint documents", and to ensure that "all

pretrial documents are to be filed with the Arbitrator and AAA on or before **Monday, August**

**5.** [sic] **2024.**" (Bolding in original.)

Neither side sent me any changes to the above schedule. Thus, I was expecting the bulk of pre-hearing documents to be submitted to me and to the AAA on or before Monday, August 5, 2024, with potential Clearview supplements being submitted by August 12. I expected those submissions to include (among other things):

- A stipulated set of joint exhibits;

- A stipulation of uncontested facts; and

- A stipulated testimonial roadmap.

But I received none of the above on August 5, 2024. Nor did I receive any indication that either side had attempted to set up a meet-and-confer to discuss submitting those documents on time. Rather, on August 6, 2024 at 2:32am ET [August 5, 2024 at 11:32pm PT], claimant's counsel sent me revised drafts of claimant's proposed (i) statement of undisputed facts, (ii) testimonial roadmap, and (iii) exhibits. Contrary to my instructions, those drafts seemingly contained no input from respondents. That was confirmed in an email from respondents' counsel, Steve Oster, at 7:08am ET on August 6, 2024, where he indicated that he thought the deadline for "joint filings" was August 12, 2024 (notwithstanding his July 9, 2024 email quoted above).

Accordingly, on August 6, 2024 at 10:04am ET, I sent counsel for both sides an email pointing out the deficiencies. Approximately 17 minutes later, at 10:21am ET, I received a calendar invitation from respondents' counsel, Mr. Oster. In addition to me, others listed as "Required" on the invitation were respondent, Donald Berlin; respondents' counsel, David Lawler and John Dean; respondents' representative, Justin Kayatin; and claimant's lawyers Collin Vierra and Jack Mulcaire. The calendar invitation had the subject line, "DEADLINE

FOR FILINGS IN CLEARVIEW v. ICI". I have no record of receiving that calendar invitation before August 6, 2024 at 10:21am ET.

Also at 10:21am ET on August 6, 2024, I received from Mr. Oster a forwarded calendar invitation with the same subject line, but that version of the calendar invitation indicated it had been sent on July 24, 2024 to only Messrs. Oster, Berlin, Lawler, Dean, and Kayatin. In other words, that calendar invitation indicated that it had been sent only internally on the respondents' side.

At 10:23am ET on August 6, 2024, I received an email from Mr. Oster stating that he "inadvertently calendared the filing date[] as the 12th" and requesting that he "be given permission to file ICI – only documents on Thursday and update the joint documents on Saturday." At 6:02pm ET on August 6, 2024, I responded with the following email order:

> Mr. Oster, I believe you are proposing that all documents previously due on Monday, August 5, 2024, should now be due on Thursday, August 8, 2024, and that all documents previously due on Monday August 12, 2024, should now be due on Thursday, August 15, 2024. That is acceptable, with the following provisos:
>
> 1.  *I will consider the exhibits already submitted by Clearview to be joint exhibits.* Per PO-1, para. 16.a.: "All joint exhibits shall be deemed admissible at the evidentiary hearing without the necessity of laying a foundation for such admission. The designation of an exhibit as a joint exhibit does not signify that both parties necessarily view such exhibit to be relevant or material to the outcome of the Arbitration but only that at least one party seeks to rely upon such exhibit and no other party has a compelling basis to object to its admissibility." Thus, at the evidentiary hearing, or in their post-hearing brief(s), respondents are free to make whatever arguments they want regarding the relevance, materiality, or authenticity of such exhibits.
> 2.  Regarding any additional exhibits either party may wish to have admitted into evidence, *counsel shall meet and confer on or before August 8, 2024* to decide whether such exhibits shall be added to the exhibits already submitted by Clearview as joint exhibits and numbered sequentially.

Case 1:25-cv-00049-JPO    Document 1-6    Filed 01/03/25    Page 58 of 69

3.    On or before August 8, 2024, counsel shall submit any contested exhibits to me, per the procedure set forth in PO-1, para. 16.b.

4.    **On or before August 9, 2024, counsel shall meet and confer** regarding (i) the **joint** statement of uncontested facts, (ii) the **joint** testimonial roadmap, (iii) an **agreed** date for the final pre-hearing conference, and (iv) the **stipulated** agenda for that conference; and they shall deliver **such joint submissions** to me on or before August 10, 2024. …

5.    If claimant incurred, or incurs, any additional costs because of respondents' failure to comply with the agreed dates for the above submissions, claimants may seek reimbursement of those costs at the close of the evidentiary hearing.

(Emphasis added.) Thus, my email order made it perfectly clear that the exhibits submitted by Clearview would be admitted into evidence as joint exhibits for the evidentiary hearing. I also reiterated that counsel would need to meet and confer – and agree on – among other things:

- any additional (sequentially numbered) exhibits either party may wish to have admitted into evidence;

- the joint statement of uncontested facts;

- the joint testimonial roadmap;

- an agreed date for the final pre-hearing conference; and

- the stipulated agenda for that conference.

Notwithstanding the above, respondents' counsel seemingly ignored my unequivocal directives. For example, on August 9, 2024 at 7:54am ET, Mr. Oster sent a document he identified as "an index of exhibits for Respondents' case in chief". Contrary to my instructions, there was no indication that respondents' counsel had discussed the proposed exhibits with claimant's counsel, much less that claimant had agreed to – or contested – such exhibits. Moreover, many of the documents listed on respondents' "index" seem to be duplicates of the (already admitted) joint exhibits, and despite my multiple requests, respondents' did not even

number the exhibits sequentially with the (already admitted) joint exhibits. Also contrary to my order, Mr. Oster indicated that he would "serve *Respondents' versions* of the joint testimonial roadmap and statement of undisputed facts [that] afternoon." (Emphasis added.)

Giving respondents' counsel the benefit of the doubt and removing any possibility of confusion, at 9:38am ET on August 9, 2024, I sent all counsel the following email:

> Counselors,
>
> On August 6, 2024, I issued the order in the [August 6 email quoted above]. Since then, I have received submissions from both sides, but it does not appear that you have complied with the order.
>
> • Per paragraph 2, you were to "meet and confer on or before August 8, 2024 to decide whether [additional joint] exhibits [should] be added to the exhibits already submitted by Clearview as joint exhibits and numbered sequentially." And per paragraph 3, "[o]n or before August 8, 2024, counsel shall submit any contested exhibits to me, per the procedure set forth in PO-1, para. 16.b." Thus, by no later than yesterday, I was expecting to receive a full set of joint exhibits, numbered sequentially, along with any contested exhibits (which I assumed would be few, if any). I received no additional exhibits – either joint or contested – yesterday. This morning, I received an email from respondents' counsel attaching a document identified as "an index of exhibits for Respondents' case in chief". That does not comply with paragraph 2 or 3.
> • Paragraph 4 of my August 6 order provides: "On or before August 9, 2024, counsel shall meet and confer regarding (i) the *joint* statement of uncontested facts, (ii) the *joint* testimonial roadmap, (iii) an *agreed* date for the final pre-hearing conference, and (iv) the *stipulated* agenda for that conference; and they shall deliver such *joint* submissions to me on or before August 10, 2024…." Notwithstanding the above, this morning's email from respondents' counsel said, "[p]er your Order from earlier in the week, I will serve Respondents' versions of the joint testimonial roadmap and statement of undisputed facts … this afternoon." That is *not* what the order requires. Please do not send me "*Respondents' versions* of the joint testimonial roadmap and statement of undisputed facts" (emphasis added). Per the order, I need: "(i) the *joint* statement of uncontested facts, (ii) the *joint* testimonial roadmap, (iii) an *agreed* date for the final pre-hearing conference, and (iv) the *stipulated* agenda for that conference".

Case 1:25-cv-00049-JPO    Document 1-6    Filed 01/03/25    Page 60 of 69

(Emphasis in original.) If you are unable to agree on many uncontested facts, the list may be short, but I do not need to see each side's draft. If you are unable to agree on a *joint* testimonial roadmap or a *stipulated* agenda for the final pre-hearing conference, then you should note the (hopefully few) areas of disagreement in the version of each that you send me. If necessary, I will order a date for the final prehearing conference, but I hope you will agree.

Please contact me with any questions.

(Emphasis in original.) Thus, I once again made it perfectly clear that counsel must *meet and confer* regarding the listed issues and deliver *joint* submissions to me on or before August 10, 2024. Indeed, I specifically instructed respondents' counsel, "do not send me *'Respondents' versions* of the joint testimonial roadmap and statement of undisputed facts'" (emphasis in original), and then I emphasized the point by saying, "I do not need to see each side's draft." Nonetheless, in direct violation of my unequivocal instructions, at 5:29pm ET that same day, Mr. Oster sent me (and claimant's counsel) *respondents' version* of the joint testimonial roadmap. And at 6:13pm ET, he sent me (and claimant's counsel) *respondents' version* of the statement of undisputed facts. Then, to make matters worse, at 8:03pm ET, Mr. Oster sent me (and claimant's counsel) a document titled, "ICI's Objections to Clearview's Exhibits", disregarding my earlier ruling that all such documents were deemed to be joint exhibits and would be admitted into evidence.

Moreover, the email exchanges between counsel show that claimant's counsel offered to meet and confer about the open issues, but contrary to my explicit order, respondents' counsel refused (or at least failed) to meet. In an email dated August 8, 2024, 7:36pm (forwarded to me in an email I received on August 9, 2024 at 9:11am ET), claimant's counsel, Mr. Vierra, says, "7pm PST I can do …. You have my number." Then, in an email to me and respondents'

Case 1:25-cv-00049-JPO     Document 1-6     Filed 01/03/25     Page 61 of 69

counsel dated August 9, 2024, 9:44am ET, Mr. Vierra states, "[as] I have informed Mr. Oster, if he calls at 7pm PST, I will pick up to discuss any other [issues]". Mr. Oster seemed to confirm the appointment in an email dated August 9, 2024, 1:44pm ET, where he states, "I am willing to participate in the meet and confer … at 10 PM EST." Then, in an email a few minutes later, Mr. Vierra reiterates, "I have already said you can call me at 7pm PST as requested, and I will answer." Then, in an email later that day, at 6:15pm ET, Mr. Vierra reiterates, "you can call me at 7pm PST". Notwithstanding Mr. Vierra's repeated invitations and Mr. Oster's confirmation, Mr. Oster apparently failed to call Mr. Vierra at the designated time (7pm PT/10pm ET), as in an email later that night, at 10:36pm ET, Mr. Vierra writes, "7pm has come and gone. I have not received any call."

Then, in an email dated August 10, 2024, 12:08am, Mr. Oster attempted to shift the blame. Contrary to the unmistakable plan set forth in the emails quoted above, Mr. Oster inexplicably stated, "I waited to see if he'd call", disregarding the earlier emails that make it clear that Mr. Oster was supposed to call Mr. Vierra, not the other way around.

Further aggravating the situation, on August 10, 2024 at 9:03pm ET, Mr. Oster sent an email to me, copying opposing counsel, claiming that "back in June [he] sent around the attached calendar entry to [me] and Clearview setting August 12, 2024, as the deadline for filings in Clearview v. ICI." He went on to argue, "Mr. Vierra, who had every reason to know [Mr. Oster] had made an error since [Mr. Vierra] received the calendar entry, did not extend the courtesy of letting [Mr. Oster] know the entry was incorrect." Mr. Oster attached to that email a pdf of a calendar entry that listed opposing counsel and me (among others) as recipients – i.e., the calendar entry I described above, titled, "DEADLINE FOR FILINGS IN CLEARVIEW v. ICI". But as discussed above, I have no record of receiving that calendar

invitation before August 6, 2024 at 10:21am ET. Mr. Vierra has also said that "calendar entry was forwarded to [him] on August 6 at 7:21am [i.e., 10:21am ET] – after ICI missed its deadline." Thus, it appears that Mr. Oster did not send the calendar entry to opposing counsel and me "back in June" as he claimed. Rather, he sent it to us after he had already missed the deadline.

## II.    Reasoning

Neither side in this arbitration has demonstrated the professional courtesies I expected. But respondents' counsel's repeated failures to comply with my orders are beyond the pale. Considering my emphatic and frequent instructions, it seems that respondents' counsel is recklessly disregarding my orders or willfully violating them, causing unwarranted delays and expense.

Commercial Rule R-24 grants me the authority to (among other things) "issue any orders necessary to … achieve a fair, efficient and economical resolution of the case".

## III.    Order

For the reasons described above, I order the following:

1.    As a part of the final award in this case, I will award claimant its costs and expenses associated with respondents' failure to comply with my orders related to the submission of:

> i.  exhibits for the evidentiary hearing;
>
> ii.  the joint statement of uncontested facts;
>
> iii.  the joint testimonial roadmap;
>
> iv.  an agreed date for the final pre-hearing conference; and
>
> v.  the stipulated agenda for that conference.

2.    Both sides shall have the opportunity to brief this issue, including quantifying costs, in their post-hearing briefs.

3.    Counsel shall meet and confer and submit to me by no later than noon ET on August 14, 2024:

       i.   exhibits for the evidentiary hearing;

      ii.   the joint statement of uncontested facts;

     iii.   the joint testimonial roadmap;

     iv.   the stipulated agenda for the final prehearing conference.

4.    Other than as specifically modified herein, prior orders remain in effect. This order and all orders entered in this arbitration shall continue in effect unless and until amended by subsequent order.

Dated: August 13, 2024

_____
Usher Winslett, sole arbitrator

FINAL 2024-11-07

# Addendum No. 3

## AMERICAN ARBITRATION ASSOCIATION

CLEARVIEW AI, INC.,

                  Claimant,

                                 AAA Case No. 01-23-0002-6322

      v.

                                 Arbitrator: Usher Winslett

INVESTIGATIVE CONSULTANTS, INC.,
and DONALD BERLIN,

                  Respondents.

## **STIPULATED ORDER**

      In lieu of arbitral briefing regarding an interim award, the above-listed parties stipulate and agree:

1.  Mr. Berlin and ICI shall not engage in any financial transactions outside of the ordinary course of business.

2.  Mr. Berlin and ICI attest that they have not disposed of, encumbered, secreted, or removed assets with the intent of frustrating collection of a potential award, if any.

3.  Mr. Berlin and ICI will not dispose of, encumber, secrete, or remove assets with the intent of frustrating collection of a potential award, if any.

        _/s/ Collin Vierra_                               _/s/ Steven Oster_
          Collin Vierra                                Steven Oster

      _Counsel for Claimant_                      _Counsel for Respondents_

It is so ordered.

Usher Winslett, Arbitrator

FILED: NEW YORK COUNTY CLERK 12/23/2024 03:57 PM
NYSCEF DOC. NO. 6
RECEIVED NYSCEF: 12/23/2024

FINAL 2024-11-07

# Addendum No. 4

## AMERICAN ARBITRATION ASSOCIATION

CLEARVIEW AI, INC.,

Claimant,

v.

INVESTIGATIVE CONSULTANTS, INC., and
DONALD BERLIN,

Respondents.

AAA Case No. 01-23-0002-6322

Arbitrator: Usher Winslett

## FEE AND COST DECLARATION OF COLLIN J. VIERRA

I, Collin Vierra, lead counsel for Claimant in the above-captioned case, being duly deposed,
attest under penalty of perjury under the laws of the State of New York:

1.  Clearview's total legal fees in this case were $401,328, as follows, with no travel time
    being billed:

    a.  Collin James Vierra – Rate: $685/hour – Hours June 2023 – September 2024: 347.4

    b.  Isaac Weitzhandler – Rate: $665/hour – Hours June 2023 – September 2024: 196.7

    c.  Daniel Kfoury – Rate: $585/hour – Hours June 2023 – September 2024: 9.1

    d.  Maria Carvajal – Rate: $335/hour – Hours June 2023 – September 2024: 54.4

    e.  Robert Dunn – Rate: $1,030/hour – Hours June 2023 – September 2024: 7.9

    f.  Mina Al-Ansari – Rate: $395/hour – Hours June 2023 – September 2024: 2.2

2.  These legal fees are amply reasonable, given that rates for commercial litigators in New
    York typically greatly exceed these rates. *See, e.g.,* Law.com, *Top Big Law Partners Are
    Earning More Than $2,400 Per Hour, as Rates Continue to Climb,* January 10, 2024.
    https://www.law.com/americanlawyer/2024/01/10/top-restructuring-partners-are-earning-
    more-than-2400-per-hour-as-rates-continue-to-climb/?slreturn=20240927142300.

3. Clearview's total costs in this case, not including any further costs paid to AAA, were $113,947.71, which is $2,018.25 less than reported in Clearview's receipts because one deposition vendor overcharged Clearview by $2,018.25 and will be issuing a credit in that amount.

Respectfully submitted,

Collin James Vierra

*Counsel for Clearview AI, Inc.*