# NOTICE OF ARBITRATION AND STATEMENT OF CLAIM

### CLEARVIEW AI, INC.,

### PLAINTIFF

### VERSUS

### INVESTIGATIVE CONSULTANTS, INC. et. al.

### DEFENDANTS

# Table of Contents

**1. Statement of Claim**……………………………………………………………..pg. 3

**2. Factual Background**

    **A. Clearview AI and Its Product**…………………………………………...pg. 3

    **B. The Parties Enter an Agreement**…………………………………………...pg. 4

    **C. ICI's Breaches of the Agreement**…………………………………………..pg. 7

**3. Cause of Action**

    **A. Count I**……………………………………………………………..………pg. 15

    **B. Count II**……………………………………………………………………….pg. 18

    **C. Count III**……………………………………………………………………pg. 19

**4. Prayer for Relief**…………………………………………………………………..pg. 20

## I. STATEMENT OF CLAIM

1. Plaintiff Clearview AI, Inc. ("**Clearview**" or "**Plaintiff**"), a New York-based corporation incorporated in Delaware, brings this action against Defendants, Investigative Consultants Inc., a Illinois corporation and affiliates and Donald Berlin, a resident of Virginia (collectively, "**ICI**", "**Defendants**" or "**the ICI Defendants**"), seeking recovery for damages arising out of Defendant's breach of contract and unjust enrichment. In support thereof, Plaintiff alleges:

## II. FACTUAL BACKGROUND

### A. Clearview AI and Its Product

2. Clearview AI, Inc. is a small technology startup, which was founded in 2018 by its Chief Executive Officer, Hoan Ton-That. Clearview provides a unique service–the world's most advanced facial recognition search engine (the "**Clearview Application**"). Clearview uses automated programs and third-party contractors to collect billions of publicly available online images, along with the webpage addresses where they appear, from a variety of sources, including social media, news media, image hosting sites, mugshot sites, and business webpages. Clearview applies a facial recognition algorithm to the images it collects. This enables Clearview to match images of unidentified individuals supplied by its clients ("**probe images**") with images of the same individual from the public Internet. Clearview's clients are all government agencies or government contractors, who use the Clearview Application for official investigative, law enforcement and national security purposes.

3.     Clearview has been recognized as a Time100 Most Influential Company.[1] Its facial recognition algorithm has been tested by the National Institute of Standards and Technology (NIST) and determined to be highly accurate. Clearview's technology has been identified as an invaluable resource for law enforcement, facilitating numerous successful investigations into homicides[2], war crimes[3], the Capitol Riot[4], and child exploitation[5].

4.     ICI is a small Virginia-based data broker company, with a website at icioffshore.com. Upon information and belief, ICI is an alter ego of its owner, President, and only known employee, Mr. Donald Berlin. The known addresses associated with the company are a business mailing address and a residence owned by Mr. Berlin.

B. **The Parties Enter an Agreement**

5.     Mr. Ton-That was introduced to Mr. Berlin in late August of 2018. ICI held itself out as a "a world-renowned creator, solution provider, and database architect", that worked with the US military and with intelligence agencies to collect, fuse and analyze large amounts of personally identifiable information. *See* Exhibit Q. In various communications throughout 2018 and 2019,

---

[1] Juliette Pearse, Clearview AI is one of the 2021 TIME100 most influential companies, Time (2021), https://time.com/collection/time100-companies/5953748/clearview-ai/ (last visited May 31, 2023).

[2] Two law enforcement agencies solve a murder and attempted murder, Clearview AI (2021), https://www.clearview.ai/success-stories/two-law-enforcement-agencies-solve-a-murder-and-attempted-murder (last visited May 31, 2023).

[3] Maia Yarova, How the facial recognition service Clearview AI helps to identify Russian war criminals in Ukraine AIN.Capital (2023), https://ain.capital/2023/05/05/how-the-facial-recognition-service-clearview-ai-helps-to-identify-russian-war-criminals-in-ukraine/ (last visited May 31, 2023).

[4] Oxford Police Department provides investigative leads to FBI, following the U.S. capitol attacks, Clearview AI (2021), https://www.clearview.ai/success-stories/oxford-police-department-provides-investigative-leads-to-fbi,-following-the-u.s.-capitol-attacks (last visited May 31, 2023).

[5] Kashmir Hill &amp; Gabriel Dance, Clearview's Facial Recognition App Is Identifying Child Victims of Abuse, The New York Times, February 7, 2020, https://www.nytimes.com/2020/02/07/business/clearview-facial-recognition-child-sexual-abuse.html (last visited May 31, 2023).

ICI made various representations and warranties to Clearview that it had the means and security clearances to lawfully provide access to a wealth of information from a variety of electronic databases containing government records, background information, arrest history information and the like. *See* Exhibit Q. ICI further represented that it could fuse data from these disparate sources and link it to a photo, generating a comprehensive report on an individual, and perform this task at scale. Clearview believed that the integration of such images into its then-developing facial recognition search engine could provide substantial value to Clearview's clients.

6.  For example, on May 30th 2019, Mr, Berlin transmitted an email to Clearview's CEO, Hoan Ton-That, stating:

> We are now able to merge the Criminal History photos and the Driver's License data and jump over to the Social Media platforms and create one merged report. Basically, it starts with the criminal history photo; which links to the criminal history data; which links to the driver's license data; which then links to the identity database. All four sources are then brought in and the resulting report is attached. *See* Exhibit R.

Berlin attached a document to this email entitled "Francis_Paul_Kuhlman Combined Criminal and Social Media Scan.pdf", which contained what purported to be a mugshot of an arrested individual, alongside information about that individual, including a residence, social security number, social media profiles, email addresses, phone numbers and likely relatives. *See* Exhibit S. This information was largely presented in a format that was, apparently, readily ingestible and searchable by Clearview's automated software systems.

7.  After further exploratory discussions, Mr. Ton That signed and transmitted a 3-page contract ("**the Term Sheet**") on July 30th, 2019. This term sheet was transmitted to Mr. Berlin and electronically signed by him on behalf of his company, ICI on July 31st, 2019. Pursuant to

the Term Sheet, Clearview AI agreed to pay ICI to deliver the following (*See* Exhibit A) (emphasis added):

> The fully complete and fully updated dataset of arrest information from all 50 states in the last 20 years up, including the name, photo and more data…shall be delivered in the timeline of 11 weeks. **Approximately 690 million arrest records and 390 million photos fully joined, and quality tested will be delivered**...**Arrest information may be delivered in either CSV or JSON or other usable format as requested by the Buyer**…Arrest information includes (at minimum): Name, State, Present and Past Address, SSN, DOB, Photo, Charges, Cell Phone or Home Phone, Email Address. All Arrest Information from 50 states will be provided.

8. In short, Clearview contracted for the delivery of 690 million textual records relating to arrested individuals and containing personally identifiable information, which were fully joined with–i.e., they could readily be linked to–390 million photos of the arrested individuals identified in the textual records (collectively, the "**Deliverables**"). These photos and records would be of great value to Clearview, as the ability to quickly and accurately search large numbers of mugshots via facial recognition and combine the images with the relevant arrest records would be highly valuable to Clearview's law enforcement customers when they use Clearview to investigate unidentified persons of interest in investigations. Clearview therefore expected that securing an exclusive right to this dataset and incorporating it into its product would drive millions of dollars of sales and greatly increase the attractiveness of the company to prospective

investors. Payment via wire transfer in the amount of $873,000.00 was duly transmitted by Clearview via wire transfer on August 1st, 2019. *See* Exhibit B.

9. By January of 2020, ICI had attempted delivery by providing five consumer-grade hard drives containing image files and textual records, in various formats including .jpg, .xlsx, .json and .txt (the "**Non-Conforming Data**"). ICI also provided a set of notes entitled "Mugsy Drive Deliverable Notes" which identified the various folders that purportedly contained the content that Clearview paid for, and ostensible instructions on how to use them, including reference to "unlinked photos". *See* Exhibit C.

10. Clearview currently possesses the original drives delivered by the ICI Defendants and created a complete and accurate backup of the delivered material which was created in March 2020 and which currently is maintained in a cloud storage account possessed by Clearview. The delivered content was deficient in several ways, as outlined below.

### C. ICI's Breaches of the Agreement

11. First, the Non-Conforming Data was not "fully joined" or "delivered in a usable format". Clearview contracted for, and expected delivery of, image files that could be readily linked to arrest records that contained names and other information–substantially similar to the "sample" which ICI had presented in May 2019. *See* Exhibit S. Instead, Clearview received millions of nameless image files that were not joined or linked with identifying records in any intelligible way, and millions of records that were located across dozens of disparate compressed folders and subfolders with no discernible organization or utility to Clearview. The Non-Conforming Data was composed of various file types, such as .txt, .xls, .db, .wd3, and .tmp files, which did not conform to the "usable format" requirement contained in the Termsheet. The "Mugsy Drive

7

Deliverable Notes" ICI also provided contained references on what Clearview should do with "unlinked" photos, something which would not have been necessary had ICI upheld its obligations under the Termsheet. *See* Exhibit C. Hundreds of thousands of files were located in the "trash" folder on one of the devices. In January 2020, Clearview employees reviewed the Non-Conforming Data provided by ICI and identified ICI's failure to properly join the data and deliver it in a usable format as a significant problem. Mr. Berlin was made aware of this problem, including but not limited to, communications made during a February 2020 meeting at Clearview's then-headquarters in New York City. In June and September of 2021, experienced and skilled computer engineers working for Clearview conducted comprehensive reviews of the delivered data and in good faith attempted to "link" or "join" the Non-Conforming Data according to the instructions provided by ICI in the "Mugsy Driver Deliverable Notes", but only about 10% of the provided records could be linked to an image file. (*See* Exhibit D). The delivered images and other data were effectively useless to Clearview.

12. The data was useless in large part because Clearview's facial recognition search engine functions only by comparing images on the basis of facial similarity; it cannot search by textual keywords. Therefore, images which were not automatically linked to other identifying or investigatively useful information from the provided arrest records were of no use to Clearview's users, because they lacked any additional textual context to gain insight on the identity of the potential image match. Likewise, the Clearview facial recognition search engine cannot search textual information, only facial images; thus, arrest and other records which could not be linked to an image could not be searched or used by Clearview. At all relevant times, Mr. Berlin was familiar with Clearview's facial recognition search engine and therefore was aware that the Non-Conforming Data would be useless to Clearview as delivered.

13.     Secondly, the quantity and quality of images and records delivered fell far short of the quantity specified in the Term Sheet. Clearview's June 2021 and September 2021 analyses of the Non-Conforming Data indicated that Clearview was able to identify, **<u>at a maximum</u>** (please note there is considerable uncertainty in these figures due to the disorganized nature of the Non-Conforming Data) *See* Exhibit D1:

- approximately 168 million records of varying quality and format, many of which apparently bore no relation to any arrest
- approximately 38 million image files, only about 6% of which could be linked to an textual record provided by ICI

Barely any of the provided records had content for each of the data types specified in the Termsheet as the minimum required.

14.     ICI was made aware of these deficiencies multiple times, including on June 29th, 2021. *See* Exhibit E. These figures stand in stark contrast to the 690 million arrest records and 390 million photos referenced in the Term Sheet and which Clearview paid ICI in advance expecting to receive. Clearview contacted ICI for an explanation of its troubling findings and to resolve the problem, but no adequate explanation or remedial action was provided. *See* Exhibit F On multiple occasions, Mr. Berlin represented to Clearview that subcontractors had been responsible for most of ICI's performance under the Termsheet. Clearview repeatedly requested that Mr. Berlin identify these contractors and put them in contact with Clearview to facilitate Clearview's efforts to render the Non-Conforming Data usable. Chief Clearview engineer Amos Kyler even offered to travel to meet in person with ICI's subcontractors, but ICI would not identify the subcontractors or enable a meeting.

15. On October 12th, 2021, ICI presented a slideshow presentation (the "**Slideshow**") to Clearview, which attempted to outline the data that ICI had provided to Clearview and explain ICI's compliance with the Termsheet. *See* Exhibit G. However, ICI's own attempt to explain its delivered data and present the facts in the best possible light, clearly demonstrates that ICI knew it was in breach of the Termsheet. In the Slideshow pared by ICI, ICI contained their own conclusory "Summary of Findings" and admitted to delivering only approximately 11.75 million image files and 61.1 million records of varying levels of completeness–**less than 1% of the data Clearview actually purchased**.

16. The Slideshow goes on to further explain the contents of certain aptly-named "Tarball Files", which are large compressed files that were composed of unjoined, disorganized subfiles with data of varying type, quality and format:

> "A test was done of the Tarball Files, the majority of which contain hundreds of millions of criminal history files. While the greater majority of the 565,000,000 records in the tar ball file are criminal history files, with identity intelligence, only approximately 38 million contained confirmed mug shots. Clearview was provided the 38 million photo images, but the 565,000,000 identity intelligence file so that in the future one could link new or incoming photos to the full identity of a person. The latter was NOT included in our previous agreement or pricing – it was provided as a bonus file and as a gesture of good faith for future contracting to acquire more photos as they became available." *See* Exhibit G.

17. In other words, ICI represented to Clearview that a maximum of only 38 million image files were provided– far less than the 390 million contracted for. ICI further represented that, at maximum, 565 million identifying records were provided in the Tarball files. Clearview's

10

engineers were unable to verify this claim primarily due to the disorganized and useless state of the original data provided. ICI openly admitted in its Slideshow that the vast majority of these unjoined Tarball file records lacked some or all of the various required identifiers listed in the Termsheet and tried to sugarcoat its poor performance and breach of the Termsheet by labeling the Tarball data as a bonus gift to Clearview. ICI stated in the Slideshow that "[the Tarball images and records] were NOT included in our previous agreement or pricing–it was provided as a bonus file and as a gesture of good faith." *See* Exhibit G. This constitutes an explicit disclaimer that any of the Tarball data counted towards ICI's performance of its obligations under the Termsheet.

18.     The final slide of the Slideshow, entitled "Conclusion", attempted to blame Clearview for ICI's failure. The "Conclusion" slide stated that "Within the ICI environment, the photos could be obtained, the identifying data elements were likewise present and a pathway link…The issue here is that the data and identifiers as delivered has become "disconnected" within the customer's platform….ICI policy is that a customer has 90 days from the point of delivery to either accept or reject data." These conclusions are transparently false. ICI's assertion that the Non-Conforming Data "has become 'disconnected' within the customers platform" is plainly impossible, because Clearview never uploaded the Non-Conforming Data to the Clearview Application. The Non-Conforming Data was inspected as delivered on the original hard drives, and found to be completely unacceptable. ICI has never identified or shown the "ICI environment" which supposedly rendered the Non-Conforming Data useful, and the Termsheet does not contemplate such an arrangement. ICI's supposed 90-day policy was nowhere

11

communicated to Clearview, is not referenced in the Termsheet, and is not referenced anywhere on ICI's website, including on pages entitled "Corporate Policy[6]" and "Terms and Conditions"[7].

19. The gulf between what the ICI Defendants promised to deliver pursuant to the Termsheet and what they actually delivered is so stark that these breaches cannot be presumed to be inadvertent. Instead, they imply fraudulent intent and willful misconduct, because they are so comprehensive, pervasive, and flagrant. This impression is reinforced by the fact that throughout ICI's contact with Clearview, Mr. Berlin showed a strong preference for modalities of communication that facilitated obfuscation. For example, Mr. Berlin's emails with Clearview were almost entirely sent via a "Hushmail" confidential email service[8], which required Clearview to log in to an ICI-controlled online portal to view messages from ICI; consequently such messages could not be retained or reviewed by Clearview. In September 2019, Mr. Berlin even demanded that Clearview's CEO delete and shred any copies of weekly "progress reports" that he submitted in the Fall of 2019 to document his attempts to perform his obligations under the Termsheet, claiming that they contained "material mistakes". *See* Exhibit G1. These attempts at obfuscation, however clumsy, reveal ICI's awareness of the unlawful nature of its conduct, and desire to conceal that conduct.

20. On June 9th, 2023, ICI's counsel provided Clearview with a letter from Bintel Inc. ("Bintel") to ICI, which stated that ICI had retained Bintel as a subcontractor in relation to the Termsheet. The letter states, in relevant part (*See* Exhibit CC):

> We received 1,533,616,627 arrest records from several vendors, which we uploaded to the database. Also, Bintel received 407,315,222 arrest photographs from separate

---

[6] Corporate policy, Investigative Consultants, http://www.icioffshore.com/about/dynamicindex7/ (last visited Jun 9, 2023).
[7] Terms and Conditions, Investigative Consultants, http://www.icioffshore.com/about/dynamicindex8/(last visited Jun 9, 2023).
[8] How Hushmail Works, https://www.hushmail.com/how-it-works/ (last visited Jun 9, 2023).

>vendors, which we uploaded to the database. Please note that these reflect the non-deduped record counts. We then joined the arrest files with the corresponding photos within our environment using the software and programs Bintel created. The database was stored on stand-alone servers and made available to Clearview, which never took delivery. The only items that Clearview sought and that we delivered were the external hard drives. Our application linked photos, arrest records, and identity-based intelligence within our environment.

Clearview is not aware of and has no record of any communication between Clearview and Bintel. Clearview is not aware of any communication from ICI or Bintel that notified Clearview of the existence of any "database" or "stand-alone server" prior to June 9th 2023. Clearview is not aware of, and did not receive, any prior communications from ICI or Bintel that notified Clearview of the existence of a "Bintel environment" or that Clearview should use any application, software or program created by Bintel. Clearview alleges that no such communications were made at any point. Clearview further alleges that no "stand-alone servers" were ever delivered to Clearview, and that any dataset which requires proprietary Bintel software to function could not possibly be compliant with the Termsheet.

21. Lastly, upon information and belief, Clearview alleges that ICI Defendants violated the exclusivity clause contained in the Termsheet. The relevant portion of the Termsheet reads as follows. *See* Exhibit A Pg. 2:

>"Exclusivity – The Seller may not sell a similar dataset to any private company which offers facial recognition technology, biometrics or security services for 3 years."

Clearview alleges that discovery will show that the ICI Defendants have contracted with other companies that provide security, biometrics or facial recognition technology and services and

provided them with datasets that are materially similar to such data as the ICI Defendants contracted to provide to Clearview or did provide to Clearview.

22. ICI is, according to its website, engaged in the business of providing data to private investigators, law firms, security firms, and other private sector actors. *See* Exhibit H. Clearview is aware that Mr. Berlin was arrested for theft in 2014 (*See* Exhibit AA Pg. 2), and identified in a criminal indictment as a supplier of confidential information to a ring of jewel thieves in 2003.[9] (*See* Exhibit BB). Clearview is also aware that Mr. Berlin is currently the defendant in a lawsuit for libel by billionaire businessman Christopher Chandler. Mr. Chandler alleges that Mr. Berlin concocted falsehoods about Chandler's involvement with organized crime and the Russian intelligence services, and represented these falsehoods as the product of well-placed confidential sources in various governments and unique databases which Mr. Berlin could access, as part of a scheme to defraud the Prince of Monaco by inducing him to pay for a bogus "dossier" of information about Mr. Chandler. *See* Exhibit AA. ICI's flagrant breach of the other terms of the agreement, the nature of its business, and Mr. Berlin's apparent history of unlawful conduct provides the basis for reasonable suspicion that the exclusivity provisions of the Termsheet were also breached.

23. Clearview submitted demand letters to the ICI Defendants on April 7th, 2023, which further put the ICI Defendants on notice of their breaches and their ongoing obligation to preserve all relevant documents and other materials related to the matters contained herein. *See* Exhibit H1. Through Counsel, the ICI Defendants acknowledged receipt of Clearview's demand letter on April 17th. The Parties have engaged in discussions aimed at efficiently resolving the dispute, but unfortunately have not been able to reach an agreement nor receive a clear answer

---

[9] Matt O'Connor & Ray Gibson, Jewelers no match for cop's theft ring, Chicago Tribune, January 21, 2003, https://www.chicagotribune.com/news/ct-xpm-2003-01-21-0301210224-story.html.

on a path to settlement. Clearview alleges, upon information and belief, that ICI was not and is not capable of performing under the Termsheet, thus performance as a remedy is not a viable path for settlement in this matter.

### III. CAUSE OF ACTION

24. Jurisdiction and venue in the State of New York are proper and New York law applies to the resolution of this dispute because the Termsheet was signed by both ICI and Clearview (signed by Clearview in New York) which contains an arbitration provision, that specified New York law as the controlling body of law and New York as the venue for arbitration. *See* Exhibit A.

25. Arbitration is a proper and lawful means of resolving this dispute because the Termsheet specifies arbitration before a single arbitrator under the rules of the American Arbitration Association as the means to resolve disputes arising out of the Termsheet and was mutually agreed to by both Clearview and ICI. *See* Exhibit A.

### COUNT I: BREACH OF CONTRACT WITH RESPECT TO THE NON-CONFORMING DATA

26. Plaintiff hereby re-alleges, and adopts by reference herein, Paragraphs 1 through 19 above, and further alleges:

27. Pursuant to the common law and the Laws of the State of New York, Clearview alleges that the ICI Defendants breached a valid, enforceable contract with Clearview and thereby damaged Clearview. To establish a claim for breach of contract, Plaintiff must allege: (1) the

existence of valid agreement; (2) the agreement was fully performed by Plaintiff; (3) Defendants failed to perform; and (4) damages resulted. *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000). "The obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract." N.Y. U.C.C. Law § 2-301. "Where the buyer has accepted goods and given notification…he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." N.Y. U.C.C. Law § 2-714. Judicial remedies available to redress an injured party in breach of contract include an award of a sum of money as damages and an award of a sum of money to prevent unjust enrichment. Restatement (Second) of Contracts § 345 (Am. Law Inst. 1981). Injured parties have the right to recover damages based on expectation interest, including recovery for damages resulting from the deficiency of the breaching party's performance and consequential losses. Restatement (Second) of Contracts § 347 (Am. Law Inst. 1981).

28. The negative consequences suffered by Clearview as a result of ICI's breach were foreseeable by ICI. Mr. Berlin was aware that Clearview anticipated substantially increased sales and increased investor interest to result from its integration of the Deliverables into the Clearview Application.

29. In the present matter, it cannot be disputed that:

(1) The Termsheet constituted a valid agreement between Clearview and ICI.

(2) Clearview fully performed its obligations under the Termsheet by transmitting payment of $873,000 to ICI.

(3) ICI failed to perform its obligations under the Termsheet because the Non-Conformning Data did not meet the specifications of the Termsheet–namely, it was unjoined, largely unusable by Clearview, and grossly insufficient in quantity and quality.

(4) Clearview was damaged by the loss of the funds it paid for ICI's anticipated performance under the Termsheet, the lack of data of sufficient value in return, and consequent inability to improve the Clearview products and services and thus generate sales revenue and further capital investments from third-parties.

30. As detailed above, prior to and at the time Clearview entered into the Termsheet with ICI, ICI made certain implied and express warranties with respect to its technological capabilities; namely that it could **collect large volumes of arrest record and image data, join them, and deliver them as a useful product.** These warranties included promises that the Deliverables would conform to the specifications provided by the Termsheet and be suitable for the intended purposes of Clearview. The Termsheet is explicitly clear on what ICI was to perform and deliver to Clearview, most notably *See* Exhibit A Pg. 1-2:

- "690 million arrest records and 390 million photos, fully joined, and quality tested will be delivered; and
- Arrest information…delivered in either CSV or JSON or other usable format as requested by Buyer"
- Arrest information includes (at minimum): Name, State, Present and Past Address, SSN, DOB, Photo, Charges, Cell Phone or Home Phone, Email Address"

31. The significantly lower quantity and quality of unjoined data delivered by ICI is not what Clearview contracted for, is of no use to Clearview, and is not something Clearview would have paid $873,000.00 for. The discrepancy between the lofty price of $873,000.00 for the promised

17

deliverables and the starkly inadequate data that Clearview actually received is so severe that it shocks the conscience of any reasonable observer. The insufficiently large amount of unjoined, disorganized data delivered by ICI was a flagrant breach of the aforementioned warranties and of the explicit terms of the Termsheet. Several Clearview AI employees, including the Clearview founder, Mr. Hoan Ton-That, and key Clearview engineering personnel made good faith efforts to cooperate with ICI to obtain a fully joined dataset as required by the Termsheet and promised by ICI. As early as January 2020, the Clearview employees asked numerous times how to join the jumbled data set provided by ICI, and ICI was consistently unable to offer a solution (*See* Exhibits I-P). Clearview reasonably expected that integration of the Deliverables into the Clearview Application would dramatically improve the utility and attractiveness of the Clearview Application to prospective customers, and thereby result in substantial sales and profits. Instead, Clearview had to dedicate significant time and resources to the ultimately unsuccessful effort to salvage anything of use from the Non-Conforming Data and was without critical funds that otherwise could have been used by Clearview to improve on and build its technology products .

32. ICI Defendant's failure to perform its obligations under the contract damaged Clearview in excess of $75,000. Clearview is entitled to actual damages in the amount of $873,000, as well as consequential damages in the amount of $5 million.

**COUNT II: BREACH OF CONTRACT WITH RESPECT TO EXCLUSIVITY**

33. Plaintiff hereby re-alleges, and adopts by reference herein, Paragraphs 1 through 25 above, and further alleges:

34.     As detailed above, upon information and belief Clearview alleges that the ICI Defendants violated the Exclusivity provision of the Termsheet by selling datasets similar to the Deliverables to at least one private buyer who offers facial recognition, biometric or security services. Such sale or sales damaged Clearview by depriving Clearview of the exclusive use of such data and thereby reducing Clearview's competitive advantage in its marketplace, reducing Clearview's ability to sell its products and to attract investor capital. Clearview is entitled to consequential damages in the amount of $1.5 million.

### COUNT III: UNJUST ENRICHMENT

35.     Plaintiff hereby re-alleges, and adopts by reference herein, Paragraphs 1 through 27 above, and further alleges:

36.     As detailed above, upon information and belief Clearview alleges that the ICI Defendants violated the Exclusivity provision of the Termsheet by selling datasets similar to the Deliverables to at least one private buyer who offers facial recognition, biometric or security services. Proceeds derived by the ICI Defendants from such a sale accrued to the ICI Defendants because of their unjust breach of the Termsheet. It would be unjust and inequitable for the ICI Defendant to retain the proceeds of their breach or breaches of the Termsheet's Exclusivity provision.

**IV. PRAYER FOR RELIEF**

37. WHEREFORE, Plaintiff Clearview AI respectfully prays for relief as follows:

    (A) A finding that the Defendants breached their obligations to Plaintiffs under the Termsheet.

    (B) A judgment awarding Plaintiff actual damages in the amount of $873,000 plus applicable interest and consequential damages of $5 million, to compensate Clearview for the expected value of the Deliverables, lost profits, and resources wasted as a result of ICI's breach

    (C) A judgment awarding Plaintiff damages of $1.5 million to compensate Clearview for the expected value of its exclusive right to use datasets similar to the Deliverables for facial recognition, biometric or security services

    (D) An award of restitution to Plaintiff of any monies unjustly obtained by ICI through sales of datasets that violated the Exclusivity terms of the Termsheet

    (E) Alternatively to (D), equitable disgorgement of unlawful profits obtained by ICI through sales of datasets that violated the Exclusivity terms of the Termsheet

    (F) Punitive damages as appropriate

    (G) Attorneys' fees, expenses, and the costs of this action.

Respectfully submitted,