EXHIBIT

**2**

## CLEARVIEW AI, INC.'S AMENDED STATEMENT OF CLAIM

**CLEARVIEW AI, INC.,**

**CLAIMANT,**

**VS.**

**INVESTIGATIVE CONSULTANTS, INC. & DONALD M. BERLIN,**

**RESPONDENTS.**

**Table of Contents**

I.    Statement of Claim ........................................................................................................ 3

II.   Factual Background ....................................................................................................... 3

    A.   Clearview and Its Product ..................................................................................... 3

    B.   Respondents Fraudulently Induce Clearview to Enter Into the Agreement ........................ 4

    C.   Respondents Breach the Agreement ............................................................................ 7

    D.   Clearview Provides Further Notice and Seeks to Informally Resolve the Dispute .......... 18

III.  Causes of Action ........................................................................................................ 18

IV.   Prayer for Relief........................................................................................................ 24

## I.    STATEMENT OF CLAIM

1.    Claimant Clearview AI, Inc. ("**Clearview**" or "**Claimant**"), a New York-based corporation incorporated in Delaware, brings this action against Donald Berlin, a resident of Virginia, and Investigative Consultants, Inc., an Illinois corporation (collectively, "**ICI**", "**Respondents**" or the "**ICI Respondents**"), seeking recovery for damages arising out of Respondents' fraudulent inducement, fraudulent misrepresentations and concealments, breaches of contract, and unjust enrichment. In support thereof, Claimant alleges:

## II.    FACTUAL BACKGROUND

### A.  Clearview and Its Product

2.    Clearview AI, Inc. is a small technology startup, which was founded in 2018 by its Chief Executive Officer, Hoan Ton-That. Clearview provides a unique service—the world's most advanced facial recognition search engine (the "**Clearview Application**"). Clearview uses automated programs and third-party contractors to collect billions of publicly available online images, along with the webpage addresses where they appear, from a variety of sources, including social media, news media, image hosting sites, mugshot sites, and business webpages. Clearview applies a facial recognition algorithm to the images it collects. This enables Clearview to match images of unidentified individuals supplied by its clients ("**probe images**") with images of the same individual from the public Internet. Clearview's clients are all government agencies or government contractors, who use the Clearview Application for official investigative, law enforcement, and national security purposes.

3.    Clearview has been recognized as a Time100 Most Influential Company.[1] Its facial recognition algorithm has been tested by the National Institute of Standards and Technology

---

[1] Juliette Pearse, Clearview AI is one of the 2021 TIME100 most influential companies, Time (2021), https://time.com/collection/time100-companies/5953748/clearview-ai/ (last visited May 31, 2023).

(NIST) and determined to be highly accurate. Clearview's technology has been identified as an invaluable resource for law enforcement, facilitating numerous successful investigations into homicides[2], war crimes[3], the Capitol Riot[4], and child exploitation[5].

4.     ICI is a Virginia-based data broker company, with a website at icioffshore.com. Upon information and belief, ICI is an alter ego of its owner, President, and only known employee, Mr. Donald Berlin. The known addresses associated with the company are a business mailing address and a residence owned by Mr. Berlin.

**B.  Respondents Fraudulently Induce Clearview to Enter Into the Agreement**

5.     Mr. Ton-That was introduced to Mr. Berlin in late August of 2018. ICI held itself out as a "a world-renowned creator, solution provider, and database architect", that worked with the US military and with intelligence agencies to collect, fuse and analyze large amounts of personally identifiable information. *See* Exhibit Q. In various communications throughout 2018 and 2019, ICI made various representations and warranties to Clearview that it had the means and security clearances to lawfully provide access to a wealth of information from a variety of electronic databases containing government records, background information, arrest history information and the like. *See id.* ICI further represented that it could fuse data from these disparate sources and link it to a photo, generating a comprehensive report on an individual, and perform this task at scale.

---

[2] Two law enforcement agencies solve a murder and attempted murder, Clearview AI (2021), https://www.clearview.ai/success-stories/two-law-enforcement-agencies-solve-a-murder-and-attempted-murder (last visited May 31, 2023).
[3] Maia Yarova, How the facial recognition service Clearview AI helps to identify Russian war criminals in Ukraine AIN, Capital (2023), https://ain.capital/2023/05/05/how-the-facial-recognition-service-clearview-ai-helps-to-identify-russian-war-criminals-in-ukraine/ (last visited May 31, 2023).
[4] Oxford Police Department provides investigative leads to FBI, following the U.S. capitol attacks, Clearview AI (2021), https://www.clearview.ai/success-stories/oxford-police-department-provides-investigative-leads-to-fbi,-following-the-u.s.-capitol-attacks (last visited May 31, 2023).
[5] Kashmir Hill &amp; Gabriel Dance, Clearview's Facial Recognition App Is Identifying Child Victims of Abuse, The New York Times, February 7, 2020, https://www.nytimes.com/2020/02/07/business/clearview-facial-recognition-child-sexual-abuse.html (last visited May 31, 2023).

Clearview believed that the integration of such images into its then-developing facial recognition search engine could provide substantial value to Clearview's clients.

6.      For example, on May 30, 2019, Mr. Berlin transmitted an email to Mr. Ton-That, stating: "We are now able to merge the Criminal History photos and the Driver's License data and jump over to the Social Media platforms and create one merged report. Basically, it starts with the criminal history photo; which links to the criminal history data; which links to the driver's license data; which then links to the identity database. All four sources are then brought in and the resulting report is attached." *See* Exhibit R.

7.      Berlin attached a sample document to this email entitled "Francis_Paul_Kuhlman Combined Criminal and Social Media Scan.pdf", which contained what purported to be a mugshot of an arrested individual, alongside information about that individual, including a residence, social security number, social media profiles, email addresses, phone numbers and likely relatives. *See* Exhibit S. This information was largely presented in a format that was, apparently, readily ingestible and searchable by Clearview's automated software systems. Mr. Berlin represented that this sample was substantially similar to the hundreds of millions of other records that he would provide for a price, and that all such data would be usable in, and useful to, the Clearview Application.

8.      After further exploratory discussions, Mr. Ton That signed and transmitted a 3-page contract (the "**Term Sheet**") to Mr. Berlin on July 30, 2019. Mr. Berlin electronically signed the Term Sheet on behalf of his company, ICI, on July 31, 2019. Pursuant to the Term Sheet, Clearview agreed to pay ICI to deliver the following:

    "The fully complete and fully updated dataset of arrest information from all 50 states in the last 20 years up, including the name, photo and more data . . . shall be delivered in the

timeline of 11 weeks. **Approximately 690 million arrest records and 390 million photos fully joined, and quality tested will be delivered . . . . Arrest information may be delivered in either CSV or JSON or other usable format as requested by the Buyer . . . .** Arrest information includes (at minimum): Name, State, Present and Past Address, SSN, DOB, Photo, Charges, Cell Phone or Home Phone, Email Address. All Arrest Information from 50 states will be provided." *See* Exhibit A (emphasis added).

9.      In short, Clearview contracted for the delivery of 690 million textual records relating to arrested individuals and containing personally identifiable information, which were "fully joined" with—i.e., they could readily be linked to—390 million photos of the arrested individuals identified in the textual records (collectively, the "**Deliverables**"). These photos and records would be of great value to Clearview, as the ability to use the Clearview Application to quickly and accurately search large numbers of mugshots via facial recognition and combine the images with the relevant arrest records would be highly valuable to Clearview's law enforcement customers when they use Clearview to investigate unidentified persons of interest in investigations.

10.     The Term Sheet required that Clearview pay $825,000 for the Deliverables and $48,000 for accompanying programming costs, for a total of $873,000. *See* Exhibit A. Clearview also had the option to pay an additional $45,000 for subsequent updates for the Deliverables, with the price locked in for 4 years, "every 6 months, or at the schedule of [Clearview's] choosing". *See id.*

11.     The Term Sheet also provided that ICI "may not sell a similar dataset to any private company which offers facial recognition technology, biometrics or security services for 3 years." *See id.*

12.     Clearview expected that securing an exclusive right to this dataset and incorporating it into its product would drive millions of dollars of sales and greatly increase the attractiveness of the

company to prospective investors. Payment in the amount of $873,000 was duly transmitted by Clearview via wire transfer on August 1, 2019. *See* Exhibit B.

13.     Despite receiving $873,000 from Clearview, ICI never provided the original Deliverables, let alone subsequent updates. Nor did ICI ever attempt or indicate any willingness or ability to provide subsequent updates.

14.     By January 2020, ICI had purported to attempt delivery by providing five consumer-grade hard drives containing image files and textual records in various formats, including .jpg, .xlsx, .json, and .txt (the "**Non-Conforming Data**"). ICI also provided a set of notes entitled "Mugsy Drive Deliverable Notes" which identified the various folders that purportedly contained the content that Clearview paid for, and ostensible instructions on how to use them, including reference to "unlinked photos". *See* Exhibit C. It should be noted that both Clearview and ICI frequently referred to work performed in relation to the Term Sheet as "Project Mugzee" or "Mugsy".

15.     Clearview currently possesses the original drives delivered by the ICI Respondents and created a complete and accurate backup of the delivered material in March 2020. Clearview maintains this information in a cloud storage account. The delivered content was deficient in several ways, as outlined below.

### C.  Respondents Breach the Agreement

16.     First, the Non-Conforming Data was not "fully joined" or "delivered in a usable format". Clearview contracted for, and expected delivery of, image files that could be readily linked to arrest records that contained names and other information—substantially similar to the "sample" which ICI presented in May 2019. *See* Exhibit S. Instead, Clearview received millions of nameless image files that were not joined or linked with identifying records in any intelligible way, and millions of records that were located across dozens of disparate compressed folders and subfolders

with no discernible organization or utility to Clearview. The Non-Conforming Data was composed of various file types, such as .txt, .xls, .db, .wd3, and .tmp files, which did not conform to the "usable format" requirement contained in the Term Sheet. The "Mugsy DriveDeliverable Notes" ICI provided also contained references to what Clearview should supposedly do with "unlinked" photos, something which would not have been necessary had ICI upheld its obligations under the Term Sheet to provide "fully joined" and in a usable format data. *See* Exhibit C. Hundreds of thousands of files were located in the "trash" folder on one of the devices.

17.    In early 2020, Clearview employees reviewed the Non-Conforming Data provided by ICI and identified ICI's failure to properly join the data and deliver it in a usable format. Mr. Berlin was made aware of this failure, including but not limited to, by communications made during a meeting in February or March 2020 at Clearview's then-headquarters in New York City. In June and September 2021, experienced and skilled computer engineers working for Clearview conducted further comprehensive reviews of the delivered data and in good faith attempted to "link" or "join" the Non-Conforming Data according to the instructions provided by ICI in the "Mugsy Driver Deliverable Notes", but only about 10% of the provided records could be linked to an image file. *See* Exhibit D. The delivered images and other data were effectively useless to Clearview.

18.    The data was useless in large part because Clearview's facial recognition search engine functions only by comparing images on the basis of facial similarity; it cannot search by textual keywords. Therefore, images which were not automatically linked to other identifying information from the provided arrest records were of no use to Clearview's users, because they lacked any additional textual context to gain insight on the identity of the potential image match. Likewise, the Clearview facial recognition search engine cannot search textual information, only facial

images; thus, arrest and other records which could not be linked to an image could not be searched or used by Clearview. At all relevant times, Mr. Berlin was familiar with Clearview's facial recognition search engine and therefore was aware that the Non-Conforming Data would be useless to Clearview as delivered.

19.    Secondly, the quantity and quality of images and records delivered fell far short of the quantity specified in the Term Sheet. Clearview's June 2021 and September 2021 analyses of the Non-Conforming Data indicated that Clearview was able to identify, at a maximum[6], only approximately 168 million records of varying quality and format, many of which apparently bore no relation to any arrest record, and approximately 38 million images files, only about 6% of which could be linked to a textual record provided by ICI. *See* Exhibit D1. These figures stand in stark contrast to the 690 million arrest records and 390 million photos referenced in the Term Sheet and which Clearview paid ICI in advance expecting to receive. Moreover, barely any of the provided records had content for each of the minimum data types required by the Term Sheet.

20.    ICI was made further aware of these deficiencies multiple times, including on June 29, 2021. *See* Exhibit E. Clearview contacted ICI for an explanation of its troubling findings and to resolve the problem, but no adequate explanation or remedial action was provided. *See* Exhibit F. On multiple occasions, Mr. Berlin represented to Clearview that subcontractors had been responsible for most of ICI's performance under the Term Sheet. Clearview repeatedly requested that Mr. Berlin identify these contractors and put them in contact with Clearview to facilitate Clearview's efforts to render the Non-Conforming Data usable. Chief Clearview engineer Amos Kyler even offered to travel to meet in person with ICI's subcontractors, but ICI would not identify the subcontractors or enable a meeting.

---

[6] Clearview notes that there is considerable uncertainty in these figures due to the disorganized nature of the Non-Conforming Data.

21.    On October 12, 2021, ICI presented a slideshow presentation (the "**Slideshow**") to Clearview, which attempted to outline the data that ICI provided and to explain ICI's compliance with the Term Sheet. *See* Exhibit G. However, ICI's own attempt to explain its delivered data and present the facts in the best possible light clearly demonstrates that ICI knew it fraudulently induced Clearview's assent to the Term Sheet, made fraudulent misrepresentations and concealments to Clearview, and was in breach of the Term Sheet. **In the "Summary of Findings" in ICI's own Slideshow, ICI admitted to delivering only approximately 11.75 million image files and 61.1 million records of varying levels of completeness—less than 1% of the data Clearview contracted and paid for.**

22.    The Slideshow further described the contents of certain aptly-named "Tarball Files", which are large, compressed files that were composed of un-joined, disorganized subfiles with data of varying type, quality, and format:

> "A test was done of the Tarball Files, the majority of which contain hundreds of millions of criminal history files. While the greater majority of the 565,000,000 records in the tar ball file are criminal history files, with identity intelligence, only approximately 38 million contained confirmed mug shots. Clearview was provided the 38 million photo images, but the 565,000,000 identity intelligence file so that in the future one could link new or incoming photos to the full identity of a person. The latter was NOT included in our previous agreement or pricing – it was provided as a bonus file and as a gesture of good faith for future contracting to acquire more photos as they became available." *See* Exhibit G.

23.    In other words, ICI represented to Clearview that a maximum of only 38 million image files were provided—far less than the 390 million contracted and paid for. ICI further represented

that, at maximum, 565 million identifying records were provided in the Tarball files. Clearview's engineers were unable to verify this claim primarily due to the disorganized and useless state of the original data provided. ICI openly admitted in its Slideshow that the vast majority of these un-joined Tarball file records lacked some or all of the various required identifiers listed in the Term Sheet and tried to sugarcoat its fraud, poor performance, and breach of the Term Sheet by labeling the Tarball data as a bonus gift to Clearview. ICI stated in the Slideshow that "[the Tarball images and records] were NOT included in our previous agreement or pricing–it was provided as a bonus file and as a gesture of good faith." *See* Exhibit G. This constitutes an explicit disclaimer that any of the Tarball data counted towards ICI's performance of its obligations under the Term Sheet.

24.      The final slide of the Slideshow, entitled "Conclusion", attempted to blame Clearview for ICI's failure. The "Conclusion" slide stated that "Within the ICI environment, the photos could be obtained, the identifying data elements were likewise present and a pathway link . . . . The issue here is that the data and identifiers as delivered has become "disconnected" within the customer's platform . . . . ICI policy is that a customer has 90 days from the point of delivery to either accept or reject data." *See* Exhibit G. These conclusions are transparently false. ICI's assertion that the Non-Conforming Data "has become 'disconnected' within the customer's platform" is plainly impossible, because Clearview never uploaded the Non-Conforming Data to the Clearview Application. The Non-Conforming Data was inspected as delivered on the original hard drives and found to be completely unacceptable. ICI has never identified or shown Clearview the "ICI environment" which supposedly rendered the Non-Conforming Data useful, and the Term Sheet does not contemplate such an arrangement. ICI's supposed 90-day policy was nowhere

communicated to Clearview, is not referenced in the Term Sheet, and is not referenced anywhere on ICI's website, including on pages entitled "Corporate Policy"[7] and "Terms and Conditions"[8].

25.     The gulf between what the ICI Respondents promised to deliver pursuant to the Term Sheet and what they actually delivered is so stark that these fraudulent acts and breaches cannot be presumed to be inadvertent. Instead, they imply fraudulent intent and willful misconduct, because they are so comprehensive, pervasive, and flagrant. This impression is reinforced by the fact that throughout ICI's contact with Clearview, Mr. Berlin showed a strong preference for modalities of communication that facilitated obfuscation. For example, Mr. Berlin's emails with Clearview were almost entirely sent via a "Hushmail" confidential email service, which required Clearview to log in to an ICI-controlled online portal to view messages from ICI; consequently, such messages could not be retained or reviewed by Clearview. In September 2019, Mr. Berlin even demanded that Clearview's CEO delete and shred any copies of weekly "progress reports" that he submitted in Fall 2019 to document his supposed attempts to perform his obligations under the Term Sheet, claiming that they contained "material mistakes". *See* Exhibit G1. These attempts at obfuscation, however clumsy, reveal ICI's awareness of the unlawful nature of its conduct, and desire to conceal that conduct.

26.     On June 9th, 2023, ICI's counsel provided Clearview with a letter from Bintel Inc. ("Bintel") to ICI, which stated that ICI had retained Bintel as a subcontractor in relation to the Term Sheet. The letter states, in relevant part:

"We received 1,533,616,627 arrest records from several vendors, which we uploaded to the database. Also, Bintel received 407,315,222 arrest photographs from separate vendors,

---

[7] Corporate policy, Investigative Consultants, http://www.icioffshore.com/about/dynamicindex7/ (last visited Jun 9, 2023).
[8] Terms and Conditions, Investigative Consultants, http://www.icioffshore.com/about/dynamicindex8/(last visited Jun 9, 2023).

which we uploaded to the database. Please note that these reflect the non-deduped record counts. We then joined the arrest files with the corresponding photos within our environment using the software and programs Bintel created. The database was stored on stand-alone servers and made available to Clearview, which never took delivery. The only items that Clearview sought and that we delivered were the external hard drives. Our application linked photos, arrest records, and identity-based intelligence within our environment." *See* Exhibit CC.

27.    Clearview is not aware of and has no record of any communication between Clearview and Bintel. Clearview is not aware of any communication from ICI or Bintel that notified Clearview of the existence of any "database" or "stand-alone server" prior to June 9, 2023. Clearview is not aware of, and did not receive, any prior communication from ICI or Bintel that notified Clearview of the existence of a "Bintel environment" or that Clearview should use any application, software, or program created by Bintel. Clearview alleges that no such communications were made at any point. Clearview further alleges that no "stand-alone servers" were ever delivered to Clearview, and that any dataset which requires proprietary Bintel software to function could not possibly be compliant with the Term Sheet. Indeed, Clearview would never have agreed to pay for data that could not be imported and used *within its own application*.

28.    Subsequent to filing its original complaint, Clearview demanded documents from ICI in discovery and thereby obtained, among other documents, another PowerPoint presentation, dated November 21, 2019, and entitled "Project Mugzee: Building a Dynamic National Criminal History & Identity (NCHI) Tool Interim Update & Future Roadmap" (the "**November 2019 PowerPoint**"), incorporated herein by reference. See Ex. DD.  This document explicitly describes ICI's efforts and future plans for performing its obligations under the Term Sheet, and clearly

states that it intends to store the data it collected for this purpose in its own web application, entirely separate from Clearview's web application. Clearview is not aware of any previous submission or communication of the November 2019 PowerPoint by ICI to Clearview. The November 2019 PowerPoint clearly states that the application developed by ICI would be accessed through a web browser or through an application programming interface ("API"), and would textually search criminal history records. No web application or API was mentioned in the Term Sheet.

29.    An API is, effectively, an interface through which different computer programs can communicate through the Internet. Accessing data through an API or a web application developed by ICI or its subcontractors would have left Clearview dependent on software owned, operated or maintained by ICI or a third party, wholly or partly incompatible with Clearview's own application, and subject to remote shutoff by ICI or a third party at any time. The Term Sheet says nothing about a web application or API, and instead states that Clearview was paying for the "full data purchase", not the right to query or use a database possessed by another company and accessed through someone else's software. Clearview needed and contracted for data that could readily be ingested into its own, unique and fully functional facial recognition system, and kept fully under Clearview's possession and control, to allow Clearview's developers the maximum (and necessary) degree of security, flexibility and control. Clearview alleges, based on its review of the November 2019 PowerPoint and other documents, that ICI intended to "perform" its obligations pursuant to the Term Sheet by offering Clearview access to the web application and API referenced in the November 2019 PowerPoint. This amounted to a bait-and-switch scheme, whereby Clearview purchased, and expected to receive, a specified amount of formatted data as specified in the Term Sheet, which Clearview could then include in its own databases and offer to its customers through its own application, but ICI instead planned to offer access to a different web

application or API, while representing that it would provide the standalone data the Clearview needed. This is, in essence, similar to the difference between purchasing a car and receiving access to an Uber account. Such a dramatic and self-serving difference between ICI's promises in the Term Sheet and its intended "performance" constitutes evidence of fraudulent intent.

30.    ICI later concealed the existence of this web application from Clearview. Even after Clearview notified ICI that the delivered data was defective, ICI did not inform Clearview of the existence of this web application at any time, or offer Clearview access to an API in an attempt to perform. Notably, the October 2021 Slideshow provided to Clearview by ICI in response to Clearview's concerns does not mention any web application, and instead only vaguely refers to an "ICI environment". Rather than being open and forthcoming in an attempt to resolve the problems created by its poor performance, ICI concealed the existence of the very web application that was a key element of its defective performance under the Term Sheet, and blamed Clearview. This constitutes further evidence of ICI's fraudulent intent.

31.    Clearview also alleges on information and belief that Respondents violated the Term Sheet's exclusivity clause. Clearview alleges, on information and belief, that discovery will show that within 3 years after executing the Term Sheet, the ICI Respondents contracted with other companies that provide security, biometrics or facial recognition technology and services and provided them with datasets that are materially similar to the data the ICI Respondents agreed to provide to Clearview.

32.    ICI is, according to its website, engaged in the business of providing data to private investigators, law firms, security firms, and other private sector actors. *See* Exhibit H. Clearview is also in possession of additional documents that show that ICI has violated the exclusivity provision of the Term Sheet. These include Mr. Berlin's recent resume (the "**Resume**"),

incorporated herein by reference. *See* Bates 000116–127 & Ex. Q. In the Resume, Mr. Berlin held himself out as someone who provides private entities with datasets that are similar to the dataset that was the subject of the Term Sheet. It states that Mr. Berlin provides services related to biometric data and facial recognition. It states that Mr. Berlin is the "Creator, developer, and architect" of "the Infinity Screening Monitoring Programs and the Continuous Evaluation Monitoring Programs", which use types of records, including "Criminal Records", "Sexual Offenses", and "Police, Bank Fraud and Law En . . . ", which are plainly the kind of records that Clearview contracted to acquire, with exclusivity, from ICI.

33.    Further, in October 2021, ICI provided Clearview with a 26-slide PowerPoint presentation ("the **Presentation**"), incorporated herein by reference. *See* Bates 000076–101 & Ex. G. The Presentation describes a "web application" product that ICI offers. It states:

> "In addition to the basic data collection, hydrology, aggregation, and fusion of source data, our application includes a number of features:
>
> . . .
>
> Includes Unique biometric picture data from criminal database farms and sources; unique text-based criminal data to provide more clarity over the criminal file and disposition."

34.    This is obviously similar to the data the ICI contracted to provide exclusively to Clearview.

35.    The Presentation also describes an ICI product called "Virtual Identity Profile". It states: "Virtual Identity Profile™ . . . [is] a dynamic abstraction of a person made up of a composite of multiple database records." Slide 22 contains an illustration which graphically depicts the inclusion of "Criminal" data in the "Virtual Identity Profile" fused file. Slide 23 of the Presentation, entitled "Building a POI or Bulk List", also contains a graphic which lists "Facial Recognition" and "Criminal Records" as elements of data processing conducted by an ICI software application.

Therefore, ICI represented to Clearview that, after the execution of the Term Sheet, it offered a software application that contained criminal records and facial recognition functionality—which it contracted to provide exclusively to Clearview.

36.    Mr. Berlin's long history of criminal activity and duplicity also creates a strong inference that he breached the exclusivity clause of the Term Sheet (and otherwise committed various fraudulent acts to Clearview's detriment). Clearview is aware that Mr. Berlin was arrested for theft in 2014, *see* Exhibit AA, and was identified in a criminal indictment as a supplier of confidential information to a ring of jewel thieves in 2003, and was recorded on a clandestine tape recording made by federal law enforcement discussing the effectiveness of law enforcement surveillance techniques with the leader of the ring, a former police officer, *see* Exhibit BB. Clearview is also aware that Mr. Berlin is currently the defendant in a libel lawsuit by billionaire businessman Christopher Chandler. Mr. Chandler alleges that Mr. Berlin concocted falsehoods about Chandler's involvement with organized crime and the Russian intelligence services and represented these falsehoods as the product of well-placed confidential sources in various governments and unique databases which Mr. Berlin could access, as part of a scheme to defraud the Prince of Monaco by inducing him to pay for a bogus "dossier" of information about Mr. Chandler. *See* Exhibit AA.

37.    ICI's flagrant misrepresentations and concealments, its representations about products and services that involve facial recognition and criminal records, breaches of the other terms of the Term Sheet, the nature of its business, and Mr. Berlin's apparent history of unlawful conduct also provide a basis for strong suspicion that ICI breached the Term Sheet's exclusivity provision.

### D. Clearview Provides Further Notice and Seeks to Informally Resolve the Dispute

38.     Clearview submitted demand letters to the ICI Respondents on April 7, 2023, which further put the ICI Respondents on notice of their fraud, breaches, and ongoing obligation to preserve all relevant documents and other materials related to the matters contained herein. *See* Exhibit H1. Through Counsel, the ICI Respondents acknowledged receipt of Clearview's demand letter on April 17, 2023. The parties have engaged in discussions aimed at efficiently resolving the dispute, but unfortunately have not been able to reach an agreement nor receive a clear answer on a path to settlement. Clearview alleges, upon information and belief, that ICI was not and is not capable of performing under the Term Sheet, having fraudulently induced Clearview to agree to the Term Sheet and having made further fraudulent misrepresentations and concealments to Clearview, and thus performance as a remedy is not a viable path for settlement in this matter.

### III.    CAUSES OF ACTION

39.     Jurisdiction and venue in the State of New York are proper and New York law applies to the resolution of this dispute because the Term Sheet signed by both ICI and Clearview (signed by Clearview in New York) contains an arbitration provision that specified New York law as the controlling body of law and New York as the venue for arbitration. *See* Exhibit A.

40.     Arbitration is a proper and lawful means of resolving this dispute because the Term Sheet, which both Clearview and ICI signed, specifies arbitration before a single arbitrator under the rules of the American Arbitration Association as the means to resolve disputes arising out of the Term Sheet. *See* Exhibit A.

### COUNT I:     BREACH OF CONTRACT WITH RESPECT TO THE NON-CONFORMING DATA

41.     Claimant hereby re-alleges, and adopts by reference herein, all prior paragraphs, and further alleges:

42.     Pursuant to the common law and the Laws of the State of New York, Clearview alleges that Respondents breached a valid, enforceable contract with Clearview and thereby damaged Clearview. To establish a claim for breach of contract, Clearview must allege: (1) the existence of a valid agreement; (2) Clearview performed its obligations under the agreement; (3) Respondent(s) failed to perform; and (4) damages resulted. *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000). "The obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract." N.Y. U.C.C. Law § 2-301. "Where the buyer has accepted goods and given notification . . . he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." N.Y. U.C.C. Law § 2-714. Judicial remedies available to redress an injured party in breach of contract include an award of a sum of money as damages and an award of a sum of money to prevent unjust enrichment. Restatement (Second) of Contracts § 345 (Am. Law Inst. 1981). Injured parties have the right to recover damages based on expectation interest, including recovery for damages resulting from the deficiency of the breaching party's performance and consequential losses. Restatement (Second) of Contracts § 347 (Am. Law Inst. 1981).

43.     The negative consequences suffered by Clearview as a result of ICI's breach were foreseeable by ICI. Respondents were aware that Clearview anticipated substantially increased sales and increased investor interest to result from its integration of the Deliverables into the Clearview Application.

44.     In the present matter, it cannot be disputed that: (1) The Term Sheet constituted a valid agreement between Clearview and ICI; (2) Clearview fully performed its obligations under the Term Sheet by transmitting payment of $873,000 to ICI; (3) ICI failed to perform its obligations

under the Term Sheet because the Non-Conforming Data did not meet the specifications of the Term Sheet—namely, it was un-joined, largely unusable by Clearview, and grossly insufficient in quantity and quality; and (4) Clearview was damaged by the loss of the funds it paid for ICI's anticipated performance under the Term Sheet, the lack of data of sufficient value in return, and consequent inability to improve the Clearview products and services and thus generate sales revenue and further capital investments from third parties.

45.     As detailed above, prior to and at the time Clearview entered into the Term Sheet with ICI, ICI made certain implied and express warranties with respect to its technological capabilities, namely that it could collect large volumes of arrest records and image data, join them, and deliver them as a useful product. These warranties included promises that the Deliverables would conform to the specifications provided by the Term Sheet and be suitable for the intended purposes of Clearview. The Term Sheet is explicitly clear on what ICI was to perform and deliver to Clearview, most notably: (1) "690 million arrest records and 390 million photos, fully joined, and quality tested will be delivered"; (2) "Arrest information . . . delivered in either CSV or JSON or other usable format as requested by Buyer"; (3) "Arrest information includes (at minimum): Name, State, Present and Past Address, SSN, DOB, Photo, Charges, Cell Phone or Home Phone, Email Address". *See* Exhibit A.

46.     The significantly lower quantity and quality of un-joined data delivered by ICI is not what Clearview contracted for, is of no use to Clearview, and is not something Clearview would have paid $873,000.00 for. The insufficiently large amount of un-joined, disorganized data delivered by ICI was a flagrant breach of the aforementioned warranties and of the explicit terms of the Term Sheet. Several Clearview employees, including the Clearview founder, Mr. Ton-That, and key Clearview engineering personnel made good faith efforts to cooperate with ICI to obtain a fully

joined dataset as required by the Term Sheet and promised by ICI. As early as March 2020, the Clearview employees asked numerous times how to join the jumbled data set provided by ICI, and ICI was consistently unable to offer a solution *See* Exhibits I–P. Clearview reasonably expected that integration of the Deliverables into the Clearview Application would dramatically improve the utility and attractiveness of the Clearview Application to prospective customers, and thereby result in substantial sales and profits. Instead, Clearview had to dedicate significant time and resources to the ultimately unsuccessful effort to salvage anything of use from the Non-Conforming Data and was without critical funds that otherwise could have been used by Clearview to improve on and build its technology products.

47.    Clearview is entitled to compensatory and consequential damages, as well as equitable remedies, for Respondents' breaches.

#### COUNT II:    BREACH OF CONTRACT WITH RESPECT TO EXCLUSIVITY

48.    Claimant hereby re-alleges, and adopts by reference herein, all prior paragraphs, and further alleges:

49.    As detailed above, upon information and belief, Clearview alleges that the ICI Respondents violated the Exclusivity provision of the Term Sheet by selling datasets similar to the Deliverables to at least one private buyer who offers facial recognition, biometric or security services. Such sale or sales damaged Clearview by depriving Clearview of the exclusive use of such data and thereby reducing Clearview's competitive advantage in its marketplace, reducing Clearview's ability to sell its products and to attract investor capital.

50.    Clearview is entitled to compensatory and consequential damages, as well as equitable remedies, for Respondents' breaches.

## COUNT III:  FRAUDULENT INDUCEMENT

51.    Claimant hereby re-alleges, and adopts by reference herein, all prior paragraphs, and further alleges:

52.    Pursuant to the common law and the Laws of the State of New York, Clearview alleges that the Respondents fraudulently induced Clearview to sign the Term Sheet by representing that the sample data they provided was representative of hundreds of millions of additional pieces of data that they could provide under the Term Sheet, and that it would be fully joined and usable within the Clearview Application. To establish a claim for fraud, Clearview must allege: (1) a material misrepresentation of fact or concealment; (2) knowledge of its falsity; (3) an intent to induce reliance; (4) justifiable reliance; and (5) damages. *Eurycleia Partners, LP v. Seward & Killsel, LLP*, 12 N.Y.3d 553, 559 (2009); S*chlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997); *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 178 (2011).

53.    The aforementioned misrepresentations were material misrepresentations that Respondents knew were false when made.

54.    Respondents intended that Clearview would reasonably rely on these representations when deciding to agree to the Term Sheet, and Clearview did, in fact, reasonably rely on these representations when agreeing to the Term Sheet.

55.    As a result, Clearview entered into a contract that Respondents knew ICI could not perform on, and devoted substantial time and resources to developing and preparing for activities under the Term Sheet, to Clearview's substantial detriment.

56.    Respondents' fraudulent inducement was willful, wanton, and indicative of a high degree of moral turpitude.

57.    Clearview is entitled to compensatory, consequential, and punitive damages, as well as equitable remedies, for Respondents' fraudulent inducement.

## COUNT IV:  FRAUDULENT MISREPRESENTATION AND CONCEALMENT

58.    Claimant hereby re-alleges, and adopts by reference herein, all prior paragraphs, and further alleges:

59.    Pursuant to the common law and the Laws of the State of New York, Clearview alleges that the Respondents made material fraudulent misrepresentations to, and concealed material information from, Clearview, including that Respondents were capable of and intended to perform under the Term Sheet, both with respect to providing the usable, fully joined data, and with respect to providing said data and similar data exclusively to Clearview. In fact, Respondents knew that they were unable and did not intend to provide the Deliverables, and that they intended to breach the exclusivity clause of the Term Sheet.

60.    Respondents further represented upon initial delivery that they had provided data that complied with the Term Sheet, when they had not.

61.    Respondents knew these representations were false when made.

62.    Respondents intended that Clearview would reasonably rely on these representations and concealments when agreeing to the Term Sheet and paying Respondents $873,000, and Clearview did, in fact, reasonably rely on these representations and concealments when agreeing to the Term Sheet and wiring $873,000 to ICI.

63.    As a result, Clearview entered into and performed under a contract that Respondents knew ICI could not perform on, and devoted substantial time and resources to developing and preparing for activities under, and performing on, the Term Sheet, to Clearview's substantial detriment.

64.    Respondents' fraudulent misrepresentations and concealments were willful, wanton, and indicative of a high degree of moral turpitude.

65.    Clearview is entitled to compensatory, consequential, and punitive damages, as well as equitable remedies, for Respondents' fraudulent misrepresentations and concealments.

## COUNT V:   UNJUST ENRICHMENT

66.     Claimant hereby re-alleges, and adopts by reference herein, all prior paragraphs, and further alleges:

67.     As detailed above, upon information and belief, Clearview alleges that the ICI Respondents violated the Exclusivity provision of the Term Sheet by selling datasets similar to the Deliverables to at least one private buyer who offers facial recognition, biometric or security services. Proceeds derived by the ICI Respondents from such a sale accrued to the ICI Respondents because of their unjust fraudulent acts and breaches of the Term Sheet. It would be unjust and inequitable for the ICI Respondents to retain the proceeds of their fraud and breach or breaches of the Term Sheet's Exclusivity provision. It would also be unjust to let the ICI Respondents retain their proceeds from their other fraudulent acts and breaches as described above, including the funds they received from Clearview under the Term Sheet.

68.     Clearview is entitled to restitution and disgorgement for ICI's unjust enrichment from its fraud and breaches.

## IV.    PRAYER FOR RELIEF

69.     WHEREFORE, Claimant Clearview AI, Inc. respectfully prays for relief as follows, in whole or in the alternative:

A.      A finding that Respondents fraudulently induced Clearview to agree to the Term Sheet, and otherwise defrauded Clearview in connection with the Term Sheet;

B.      A finding that Respondents breached the provisions of the Term Sheet as described above;

C.      Compensatory and consequential damages in an amount to be determined at the hearing;

D.      Pre-judgment interest;

24

E.    Punitive damages for Clearview's fraud claims;

F.    Restitution;

G.    Disgorgement;

H.    Rescission;

I.    Attorneys' fees, costs, and expenses associated with this action.

Respectfully submitted,

*Thomas Mulcaire*

Thomas Mulcaire, General Counsel

Kristin Luciano, Associate Counsel

Maria Ibrahim, Associate Counsel

Clearview AI, Inc.