EXHIBIT

**3**

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| **CLEARVIEW AI, INC.,** | **AAA Case No. 01-23-0002-6322** |
| **Claimant,** | |
| **v.** | **Hearing Date: TBD** |
| **INVESTIGATIVE CONSULTANTS, INC.,** *et al.*, | **Hearing Location: New York, NY**<br>**Arbitrator: TBD** |
| **Respondents.** | |

### RESPONDENTS ICI AND DONALD M. BERLIN'S
### ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM

Respondents Investigative Consultants, Inc. ("ICI") and Donald Berlin ("Mr. Berlin") respectfully submit this Answering Statement, as authorized by Rule 5(a) of the Commercial Arbitration Rules. Claimant Clearview AI ("Clearview") is entitled to none of the relief it seeks in this proceeding and Respondents deny any and all liability to Claimant.

ICI fully completed the contract with Clearview dated July 30, 2019, which is the subject of this proceeding. (Demand Ex. A to the Notice of Arbitration and Statement of Claim.) The contract (drafted, edited, and completed in its entirety by Clearview and therefore where ambiguous to be construed against Clearview under the familiar doctrine of *contra preferentum*) required ICI to deliver a "fully complete and updated dataset of arrest information from all 50 states in the last 20 years up" including certain arrest records and photos "fully joined." (Demand Ex. A at 1.) Clearview's statement of its claim fails to disclose the two-step process Clearview established in its contract by which ICI was required to deliver the dataset.

First, ICI was required to deliver "the raw data," *i.e.,* the **"separate** image data set and the records data." (Demand Ex. A at 2, emphasis added.) The contract required Clearview to "receive the raw data and do a check" and allowed it "1-week" to complete that check. (*Id.*)  Only after Clearview completed that check was ICI required to undertake the second step, *i.e.,* "to join the data and do quality assurance." (*Id.*)

In the interim, on January 15, 2020, ICI delivered, and Clearview accepted, a sample of a fully joined data set. The very next day on January 16, 2020, Clearview's CEO Mr. Hoan Ton-That ("Hoan") reported that he "downloaded the sample . . . and everything looks fine, it has all the information we need. In fact, it is quite comprehensive and quite well structured for extensions." (Ex. 1).

On February 11th, 2020, ICI hand delivered the complete raw data (the "First Step"), as the contract required, by delivering in person several hard drives with that data to Clearview at its offices in New York. Conspicuous by its absence from Clearview's claim is any allegation that Clearview completed the required check within the contractually required one-week time frame or that it reported to ICI any problems with that data during the one-week period. In fact, on information and belief, upon receipt of the hard drives, Clearview simply locked them in a safe. Further, according to Clearview itself, it didn't complain to ICI until June 29, 2021—

more than 16 months after the delivery of the hard drives and well beyond the deadline for Clearview to decline acceptance of the drives.

After the February 11, 2020 hand delivery of the hard drives, and despite Clearview's failure to "do a check" of the data, as required in the contract that Clearview drafted, ICI and its subcontractor completed the second step required by the contract. They joined the data, which means that the "separate image data set" (*i.e.*, the photographs) were joined to the arrest records, as well as the identity intelligence records, together with many other files such as social media handles, so that a photograph and an arrest record, and the identity data could be seen together. ICI purchased four servers and stored the joined data on those servers. Much to ICI's surprise, Clearview refused to accept the servers, and indeed, stated at the time of the delivery of the Hard Drives that it did not want the servers or the data drives to be placed on their systems because of pending national litigation against Clearview. Specifically, Hoan stated at the time of delivery that the drives were going into the safe and were not going to be touched or integrated into Clearview's processes per Clearview's lawyers because of the national litigation.

In the interim between the signing of the contract and the delivery of the hard drives, Clearview was sued in numerous lawsuits by private individuals and various state governments, alleging it engaged in unlawful practices in acquiring and using individuals' identifying data. The Judicial Panel on Multi-District Litigation

consolidated many of those actions in the United States District Court for the Northern District of Illinois. On information and belief, Clearview decided that possession of the servers with the wholly joined data would be detrimental to its defense of those actions, and it therefore instructed ICI not to deliver the servers and Clearview placed into a safe the hard drives Clearview had already accepted. Clearview, however, expressed no dissatisfaction with ICI's performance of the contract at that time. On the contrary, Clearview hired ICI to perform additional data searches to support its defense of the lawsuits.

ICI retains possession of the servers, as well copies of the hard drive data, and remains ready, willing, and able to deliver them to Clearview, thereby providing Clearview with the joined data required by the contract. Clearview apparently no longer wants the joined data that ICI has assembled pursuant to the contract. Instead, it wants money. But ICI did not breach the contract; Clearview breached its own contract by not timely inspecting, accepting, rejecting or amending its request for the data and by refusing to accept the servers with the joined data.

ICI, therefore, fully performed the contract. Alternatively, by refusing to accept the servers, Clearview waived its right to receive the fully joined data and/or prevented ICI from delivering what the contract required. Moreover, Clearview is barred from any remedy by its failure to notify ICI of any defects in the data within a reasonable time after receiving it. N.Y. U.C.C. § 2-607(3).

Clearview also alleges that ICI breached the exclusivity provision of the contract, which prohibits ICI from selling "a similar dataset to any private company which offers facial recognition technology, biometrics or security services for 3 years" (Demand Ex. A at 2).[1] Clearview alleges no facts to support its claim. It does not identify any company to which ICI sold the data, it does not say when any such sale supposedly took place, and it provides no evidence of any such company making use of any of the data that ICI collected. The reason for Clearview's failures is both simple and obvious: ICI did not sell the data it collected for this contract or any similar data set to anyone. Clearview's claim is based entirely upon speculation, whose source appears to be certain allegations made in the complaint in an unrelated case filed in the United States District Court for the District of Columbia. Most of those allegations were stricken by the District Judge in that case and sealed upon a finding that they were "beneath the dignity of this Court." (Ex. 2) Clearview provides no explanation of how it obtained the sealed complaint and offers no justification for relying upon allegations stricken by the Court.

---

[1] Clearview's unsupported speculation that ICI breached the exclusivity provision forms the basis of both its second count (breach of contract) and third count (unjust enrichment). Neither count has any basis in law or fact for the simple reason that ICI did not sell the data to anyone. We note the irony of these claims – Clearview says it was grievously injured because ICI sold Clearview's competitors data that Clearview says is worthless.

Clearview also alleges no facts to support its conclusion that ICI is Mr. Berlin's alter ego. Accordingly, there is no basis to hold Mr. Berlin liable even if the Arbitrator somehow were to conclude that ICI is liable to Clearview.

**WHEREFORE**, ICI respectfully requests the Arbitrator enter a judgment in ICI and Mr. Berlin's favor dismissing Clearview's arbitration demand in its entirety.

## <u>AFFIRMATIVE DEFENSES</u>

Respondents ICI and Mr. Berlin incorporate the preceding paragraphs of this Answer, Affirmative Defenses, and Counterclaim as if fully set forth herein and state the following as their affirmative defenses:

1. Some or all of the demand fails to state a claim upon which relief can be granted.

2. Some or all of the demand is barred by the doctrine of unclean hands.

3. Some or all of the demand is barred by the doctrine of laches.

4. Some or all of the demand is barred by Claimant's contributory/comparative negligence.

5. Some or all of the demand is barred by estoppel.

6. Some or all of the demand is barred by UCC § 2-607(3).

7. Some of all of the demand is barred by the doctrine of impossibility.

8. Some of all of the demand is barred by the doctrine of waiver.

## COUNTERCLAIM
## <u>BREACH OF CONTRACT</u>

1. Respondents ICI and Mr. Berlin incorporate the preceding paragraphs of this Answer, Affirmative Defenses, and Counterclaim as if fully set forth herein.

2. Complainant has admitted the July 30, 2019 contract ("Contract") between Clearview and ICI is a valid, enforceable agreement.

3. Pursuant to the Terms of the Contract, Clearview had a duty to pay ICI a total of $918,000 upon ICI's performance of the agreement.

4. ICI fully performed the agreement, except to the extent Clearview refused to accept the servers with joined data. On information and belief, Clearview refused to accept the servers not because of any failure of performance on ICI's part, but because Clearview was involved in litigation and Clearview and its counsel believed that acceptance of the servers would be detrimental to its defense of the pending litigation.

5. ICI remains ready, willing, and able to deliver the servers and joined data in accordance with the Contract.

6. Notwithstanding ICI's complete performance of the Contract (except to the extent prevented by Clearview, ICI received only $873,000, less than the full contract price (Demand Ex. B).

7. Clearview owes ICI $45,000, plus prejudgment interest.

WHEREFORE, ICI respectfully requests the arbitrator award ICI $45,000, prejudgment interest, attorneys' fees, and such other relief as the arbitrator deems just and appropriate.

## **CONCLUSION**

For all the above reasons, Clearview should recover nothing on its claims, ICI should recover $45,000 on its claim, and Clearview should be required to pay the costs of the arbitration as well as Respondents' costs and a reasonable attorneys' fee.

June 30, 2023                                          Respectfully submitted,

*/s/ John P. Dean*
John P. Dean
NYS Bar No. 1661362
Steven M. Oster
David W. Lawler
**OSTER McBRIDE PLLC**
1320 19th Street, N.W., Suite 601
Washington, DC 20036
202.596.5291 (Phone)
703.577.8785 (Cell)
202.747.5862 (Fax)
soster@ostermcbride.com
cmcbride@ostermcbride.com.

*Counsel to Respondents*

## <u>CERTIFICATE OF SERVICE</u>

I certify that I caused a copy of the attached Answering Statement to be served by electronic mail on counsel to Claimant.

June 30, 2023                                     */s/ Steven M. Oster*
                                                   Steven M. Oster

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| **CLEARVIEW AI, INC.,** | **AAA Case No. 01-23-0002-6322** |
| **Claimant,** | |
| **v.** | **Hearing Date: TBD** |
| **INVESTIGATIVE CONSULTANTS, INC.,** *et al.***,** | **Hearing Location: New York, NY**<br>**Arbitrator: TBD** |
| **Respondents.** | |

## RESPONDENTS ICI AND DONALD M. BERLIN'S <u>ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM</u>

# <u>EXHIBIT ONE</u>

----- Forwarded message from hoan@clearview.ai -----
Date: 1/16/2020 at 7:38 AM
Subject: Re: Fwd: Re: SERVER ARRIVED
To: "Donald M. Berlin" <dberlin@icioffshore.com>

Don

1. I have downloaded the sample. The JSON looks fine, it has all the information we need. In fact, it's quite comprehensive and quite well structured for extensions (aka "criminal" field).
2. Each entry is long, but that's ok - perhaps the "_explanation" field is not-needed if we are worried about size (each record is pretty massive, your call).
3. We still want to purchase DL data, still working on finance, and have done technical DD - we have other things we are dealing with in the short term: media, so our hands are quite full right now. As for extra fields, if this schema can support DL data, we should be fine.
4. Ideally we get a dump of the initial files (JSONs and ZIP of images). Each week or month, we get an update (JSON and ZIP of images) that are shipped over. It doesn't have to be all the records, just the new / updated ones. That's ideal for us, because we can run the same import script.

If you have an API, we should just be able to query new records that are beyond a certain date, and get the same data. Bulk import is preferred of course, which we can automate.

Apologies that things have been busy, we have a lot of media inquiries due to our popularity right now, and are figuring out how to deal with it.

You have green light to get this going in the current format. Let's have a quick call tomorrow just to confirm some quick things.

Thanks

Hoan


On Wednesday, January 15, 2020, 11:14 PM EST, "Donald M. Berlin" <dberlin@icioffshore.com> wrote:

> Hoan
>
> Need desperate help on this as we are like at the five yard line and once we cross, its really tough turning back.
>
> 1. Has the team downloaded and tested the sample?
>
> 2. Do they have any feedback on additional needs or "asks"?
>
> 3. Can they provide any guidance on future data acquisition needs at Phase II as it impacts how we do the final deliverable on Phase I as far as coding, the application, the fields of data that we need to accommodate -- many other technical factors?
>
> 4. What is your preference for the deliverable?  Remember, this is a "live" API to a slave server and ultimately all the data and the application will be in a API within AWS for you to interact with; and for us to append as new data becomes available.  I have asked several times for feedback with no response from the team beyond delivering the data itself in a single silo.  But, we really need feeback as to what you see, how we can make it better, what would constitoute a "win win" for Clearview and for us, etc.
>
> Anyway, right now, the slave server is about to be loaded and delivered back to the integrators -- Its in Washington and will be flown out on Friday night. The plan was to work on the final over the weekend and then execute the deliverable next week -- but the question really is 1 to 4 above.
>
> Whatever your folks can do to help -- I would be most grateful for because I want this to work for you and exceed expectations.
>
> Don
>
>
>
> HI Tom
>
> Best we talk in person with THomas to go over some options and then get you on the blower to see if its feasible.  I have asked them several times for feedback and so far, I get no response on that issue for some reason or another.
>
> Let me send them another note.
>
> D

On 1/15/2020 at 2:09 PM, tom.marsh@bintel.io wrote:

Hi Don

Right now the guys are working on the application transfer so we'll be ready to go when the server gets here. All the data is done, photos, and all other deliverables for Phase I is finished.

The plan was to get feedback from the client from the sample so we would know first,, did they like what they tested in the sample? And second, what exactly does the winning demo/deliverable need to be? We don't have time to misunderstand the winning spec so this feedback is critical.

As for the mechanics, we agreed we cannot leave a machine with our IP on it for obvious reasons related to the PII and PAI and DPPA converted data, but understand its required for a win that the client gets to do hands on testing. For now best way to think of that is to get the system ready, make sure we can deliver the winning metrics and bring it out for a week for live testing attended by us. Please obtain feedback from the customer as to how they wish to proceed and we will execute accordingly.

Can we have a conference call to discuss? Embedded in the above is a better understanding of what Phase II opp spec, timing and value is, but really need some good dialogue with our leader, mainly because Phase I is greatly impacted by whatever happens on Phase II from a coding and integration perspective and moreover -- slave server room and power.

Thomas will also be there Friday for you too to discuss so maybe just patch me in when you meet.

Tom

On Wednesday, January 15, 2020, 2:47 AM MST, "Donald M. Berlin" <dberlin@icioffshore.com> wrote:

T

Customer anxiousness has set in big time as we are way over due on the final deliverable. Two questions:

a. How fast can you load up the new slave server and finish final?

b. How are we going to get all of the data, files, application, etc., to the customer so that they can do actual testing? Depending on the size, can it all be loaded onto an external Hard Drive? Or, can it be loaded onto a "new computer" that we will call the Mugzee Customer Transit Computer? Or some sort of FTP Transfer? Or must it be done in person at their location in NY?

What sayeth 'uze?

d

Hi Don,

I will make arrangements to have it double packed at ups.

In regards to the size of the box, would it fit in a checked bag? If so that can be
another layer of protection.

Thanks,

Thomas

---

**From:** "Donald M. Berlin" <dberlin@icioffshore.com>
**Date:** Monday, January 13, 2020 at 8:53 PM
**Subject:** Re: SERVER ARRIVED

Hi Tom

I can bring to you, but the issue is how you are going to get it to the airport and up
to at least the entry door. The bus from the Motel may allow you to bring it, as its not
that large, its just heavy, about 65 pounds.  Next issue is whether it should be
double packed at UPS, which I definitely would do.  So, my vote would be to get a
car if for no other reason that may wish to have this packed in an outter box with
bubble wrap.

d

On 1/13/2020 at 11:53 AM,

> Hi Don,
>
> Fly in Thursday night and flight out on Friday at 4pm.
>
> Staying at the same Marriott. Let me know if I need to drive out to the
> farm to pick it up as I will get a rental car.

Thanks,

Thomas

**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| **CLEARVIEW AI, INC.,** | **AAA Case No. 01-23-0002-6322** |
| **Claimant,** | |
| **v.** | **Hearing Date: TBD** |
| **INVESTIGATIVE CONSULTANTS, INC.,** *et al.*, | **Hearing Location: New York, NY** |
| | **Arbitrator: TBD** |
| **Respondents.** | |

**RESPONDENTS ICI AND DONALD M. BERLIN'S**
**<u>ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM</u>**

# <u>EXHIBIT TWO</u>

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **CHRISTOPHER CHANDLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 18-cv-02136 (APM)** |
| | ) | |
| **DONALD BERLIN, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>ORDER</u>

Defendants Donald Berlin and Investigative Consultants, Inc. (collectively, "Defendants"), move to strike certain allegations from Plaintiff Christopher Chandler's Complaint. Defs.' Emergency Mot. to Strike, ECF No. 4 [hereinafter Defs.' Mot.]; Defs.' Mem. of Law in Supp. of Defs.' Mot., ECF No. 4-1 [hereinafter Defs.' Mem.]. For the reasons stated below, Defendants' Motion is granted in part and denied in part.

Under Federal Rule of Civil Procedure 12(f), a court may strike from a pleading any "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). An allegation is "immaterial" or "impertinent" "when it is not relevant to the resolution of the issue at hand." *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 224 F.R.D. 261, 263 (D.D.C. 2004). "Scandalous" matter refers to "any allegation that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court." *Pigford v. Veneman*, 215 F.R.D. 2, 4 (D.D.C. 2003) (internal quotation mark omitted). Although motions to strike are generally disfavored, a court has "liberal discretion" to strike such matter as it deems appropriate. *Id.* (quoting *Stanbury Law Firm v. IRS*, 221 F.3d 1059, 1063 (8th Cir. 2000)).

This is a libel case, and libel plaintiffs often feel deeply wronged because of the damage inflicted on their reputation and standing in the community as a result of allegedly false statements published by the defendant. But that sense of aggrievement is not a license to draft a nasty and snide complaint of the kind filed in this case. One of the plain purposes of Plaintiff's Complaint is to embarrass and humiliate Defendant Berlin. How else to explain the inclusion of the photograph in the very first paragraph of the Complaint? *See* Compl., ECF No. 1, ¶ 1. The photograph has absolutely no relevance to the events in question, and its incorporation into the pleading is beneath the dignity of this court.

Another clear objective of the Complaint is to cast Berlin in a sinister and pernicious light. Why else use the hyphenated descriptor contained in the third sentence in the first paragraph and include similar such references elsewhere in the Complaint? *See id.* ¶¶ 1, 20, 27. That characterization is based on no more than a single, passing reference to Berlin in a 15-year-old news article. *See id.* ¶ 27 & n.13; Notice of Submission, ECF No. 2, Ex. 7, ECF No. 2-7. The cited article contains no substantiation of the claimed connection between the article's subjects and an alleged crime organization, let alone facts that would tie Berlin to such an organization. The characterization in question may be rooted in some public allegation, but its use here has no valid purpose.[1]

The Complaint also seeks to create a caricature of Berlin as devious and deceitful. Why else repeatedly highlight misdemeanor convictions[2] that post-date the events in question by a decade, when the offense conduct does not necessarily bare on Berlin's character for truthfulness

---

[1] The same holds true for the allegation contained in paragraph 26.

[2] It is not clear to the court whether Berlin was convicted of one or two misdemeanor theft offenses, but the actual number is not relevant. *Compare* Compl. ¶ 1 n.1 (referencing two counts of larceny but noting the "charges were dismissed"), *and id.* ¶ 33 (referencing two counts of larceny and a subsequent pickpocketing incident), *with* Defs.' Mem. at 7 (admitting pleading to one charge but noting dismissal of the other).

and honesty?  *See id.* ¶¶ 1, 20, 33.  Without more detail concerning the offenses, Plaintiff is wrong

to suggest that Berlin's convictions will be admissible under Federal Rule of Evidence 609(a)(2),

*see* Pl.'s Opp'n to Defs.' Mot., ECF No. 12, at 9–10.  *Cf. United States v. Crawford*, 613 F.2d

1045, 1049 (D.C. Cir. 1979) (holding that shoplifting is not a crime of dishonesty or false

statement); *United States v. Fearwell*, 595 F.2d 771, 776 (D.C. Cir. 1978) (reaching same

conclusion for petit larceny).

Finally, in keeping with Plaintiff's efforts to embarrass and humiliate Defendant Berlin,

the Complaint gratuitously takes a swipe at Berlin's spouse, implying that she is, at best, ashamed

of her husband or, at worst, complicit in his affairs.  *See* Compl. ¶ 34.  What other end could be

served by identifying her by name and attaching page after page of her Facebook postings?  *See*

Notice of Submission, Ex. 8, ECF No. 2-8.  Does the fact that Ms. Berlin regularly posts about

books, positive messages, and the benefits of yoga, but not about her husband or his business,

make it more likely that her husband made libelous statements more than a decade ago?  Such

innuendo has no place in Plaintiff's Complaint.

The only allegations that Defendants seek to strike that are arguably relevant to Plaintiff's

libel claims concern the grammar and spelling errors in the "Pitch."  *See* Compl. ¶ 32.  Such sloppy

drafting arguably is relevant to proving actual malice.  *Cf. id.* ¶ 83 (alleging that Defendants "acted

with actual malice").  But even as to these allegations, Plaintiff cannot resist using demeaning

language, as reflected in the second clause of the first sentence of paragraph 32.  Don't the

typographical errors speak for themselves?  Why the need to demean?

For the foregoing reasons, the court orders stricken from the Complaint those allegations

and exhibits listed on pages 2 and 3 of Defendants' Memorandum of Law in Support of their

Motion to Strike, except paragraph 32, as to which only the second clause of the first sentence is

stricken. *See* Defs.' Mem. at 2–3; *Pigford*, 215 F.R.D. at 5 (striking pleading from the record).
To effectuate the court's rulings, the clerk of the court shall seal the following documents: (1) the
Complaint, ECF No. 1; (2) Defendants' Emergency Motion, ECF No. 4, and Reply in Support,
ECF No. 13; and (3) Plaintiff's Opposition, ECF No. 12. *See* Fed. R. Civ. P. 5.2(d) (authorizing
court to place filings under seal). No later than October 22, 2018, the parties shall file redacted
versions of the foregoing documents that strike the "immaterial, impertinent, or scandalous matter"
discussed above.

Dated: October 16, 2018

Amit P. Mehta
United States District Judge

4